## AFFIDAVIT OF TASK FORCE OFFICER STEVEN RACKI

I, Steven Racki, a Task Force Officer with the Drug Enforcement Administration, being duly sworn, depose and state as follows:

## INTRODUCTION

1.      I am a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA") of the United States Department of Justice assigned to the DEA Boston Tactical Diversion Squad by the Massachusetts State Police ("MSP"), since October 2013.

2.      As a DEA TFO, I am authorized to investigate violations of the laws of the United States, including violations of the federal narcotics laws in Title 21 of the United States Code. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), *i.e.*, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

### A.      *Training & Experience: Narcotics Investigations*

3.      I became a Massachusetts State Trooper in August 1999, and I was assigned to the MSP Division of Field Services as a uniformed patrol officer. While serving in this capacity, from August 1999 until August 2002, I was stationed in Athol, Concord, and Revere, Massachusetts. While assigned to uniformed patrol, I made and/or assisted in hundreds of arrests involving narcotics violations. In August 2002, I was re-assigned to the MSP Division of Investigative Services, where I worked in the State Police Detective Unit/Narcotics Task Force of the Suffolk County District Attorney's Office. I worked in this capacity until March of 2007 when I was re-assigned to the MSP State Police Detective Unit/Narcotics of the Essex County District Attorney's Office.

4.      In October 2013, I transferred to the DEA Boston Tactical Diversion Squad and received extensive training in narcotics enforcement. During my time as a narcotics investigator,

I have participated in hundreds of investigations involving all facets of the narcotics industry, including smuggling, money seizures, and property seizures. I have participated in investigations in both overt and undercover capacities. Over the course of my career in law enforcement, I have served as the affiant in numerous search warrants and Global Positioning System ("GPS") warrants. I have personally participated in investigations involving conventional and electronic surveillance, as well as the authorized electronic interception of conversations.

5.      Furthermore, while acting in an undercover capacity, I made over 200 purchases of illegal narcotics. These narcotics purchases included a wide-ranging assortment of controlled substances, including heroin, cocaine, ecstasy, marijuana, and oxycodone, and ranged in quantity from small "street-level" purchases to larger "trafficking" weight purchases. I have also interrogated numerous defendants and suspects who were users, sellers, and distributors of illegal narcotics, and have also interviewed and debriefed cooperating witnesses and confidential informants concerning the distribution of illegal narcotics.

6.      On the basis of my training and experience, I am familiar with the vernacular of illegal narcotics abusers and distributors. I am acquainted with the methods by which such persons seek to disguise the subject of their conversations and operations, and I am familiar with the full range of methods, practices, and techniques by which members of organized conspiracies illicitly transport and distribute controlled substances.

7.      Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities. However, drug traffickers are aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple

cellular phones at the same time, and/or utilizing prepaid cellular phones where the user of the phone is not required to provide personal identifying information. I am also aware that drug traffickers frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I am familiar with the manner in which narcotics traffickers use telephone, coded, veiled, or slang-filled telephone conversations when discussing their illegal business, in an effort to further prevent detection, and that they often use text messages in lieu of phone calls to avoid speaking over the telephone. I am familiar with the "street" language used by drug traffickers, as well as the methods they use to disguise conversation and operations.

### B.   *Experience In Present Investigation*

8.      I have personally participated in the investigation of the people named in this affidavit since approximately March 2014. I am familiar with the facts and circumstances of this investigation from oral and written reports made to me by other members of the DEA, other federal, state, and local law enforcement agencies. I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information (whether received directly or indirectly) that I believe to be reliable from numerous sources including, but not limited to, the following:

    (1)    My training and experience investigating drug-trafficking;

    (2)    Oral reports, written reports, and documents that I have received from other federal, state, and local law enforcement agents;

    (3)    Physical surveillance conducted by me and other federal, state, and local law enforcement officers;

    (4)    Confidential sources of information;

    (5)    Public records;

(6)     Business records;

(7)     Telephone toll records, pen register and trap and trace information, and
        telephone subscriber information;

(8)     GPS tracking device data;

(9)     Controlled purchases of drugs;

(10)    Drug seizures;

(11)    Queries of law enforcement records and intelligence databases; and

(12)    Evidence obtained from judicially-authorized intercepted communications
        over Target Telephones #1, #2, #3, and #4 (as described below).

## PURPOSE OF AFFIDAVIT

9.      This affidavit is being submitted in support of a criminal complaint against the
following individuals:

(1)     Joseph ROMANO (hereinafter, "ROMANO");

(2)     Anthony PANARESE (hereinafter, "PANARESE");

(3)     Jarod PRESTERONE (hereinafter "PRESTERONE");

(4)     Paul WILLIAMS (hereinafter, "WILLIAMS");

(5)     David TURNER, SR. (hereinafter, "TURNER SR.");

(6)     Ashley TURNER (hereinafter, "A. TURNER");

(7)     Sans MILBURY (hereinafter, "S. MILBURY"); and

(8)     Marcelle MILBURY (hereinafter, "M. MILBURY")

(collectively, the "DEFENDANTS") charging that beginning at least in or about March 2014 and

continuing until the present, each did knowingly and intentionally combine, conspire,

confederate, and agree with others known and unknown, to possess with intent to distribute and

to distribute oxycodone, a Schedule II controlled substance, in violation of 21 U.S.C.

§§ 841(a)(1) and 846.

10.     This affidavit is also being submitted in support of applications for search warrants for the following target locations, which are described in greater detail in Section III. B. of this affidavit and in attachments to the relevant warrant applications and warrants:

(1)     4 Jill's Way, Peabody, Massachusetts (hereinafter, the "ROMANO residence" or "Target Location #1")[1];

(2)     8 Moore Street, Peabody, Massachusetts (hereinafter, the "PANARESE residence" or "Target Location #2")

(3)     39 Broadway, Unit #304, Malden, Massachusetts (hereinafter, the "WILLIAMS residence" or "Target Location #3")

(4)     1 Donegal Road, Peabody, Massachusetts (hereinafter, the "TURNER residence" or "Target Location #4");

(5)     11 Hardy St, Danvers, Massachusetts (hereinafter, the "MILBURY residence" or "Target Location #5"); and

(6)     3 Benevento Circle, Peabody, Massachusetts (hereinafter, the "VAUGHN residence" or "Target Location #6") (collectively, the "Target Locations").

11.     This affidavit does not set forth all the facts developed during the course of this investigation. Rather, it sets forth only those facts that are necessary and sufficient to establish probable cause to believe that the DEFENDANTS identified herein have committed the above-described controlled substance offenses and that evidence, fruits, and instrumentalities of these offenses will be found in the Target Locations as described in Section III. B. of this affidavit.

## SUMMARY OF EVIDENCE

### I.     Background of the Investigation

12.     The DEA began investigating the drug trafficking activities of ROMANO and his associates in March 2014. Through the use of confidential sources, sources of information,

---

[1]  An explanation as to how investigators know which Target Location pertains to a specific DEFENDANT is also provided in Section III. B. of this affidavit.

physical surveillance, pole cameras, the use of an undercover agent, controlled purchases of oxycodone, analysis of telephone toll records, the use of court-authorized GPS tracking devices, pen register/trap and trace, and court-authorized wiretaps of telephones used by ROMANO and his associates, agents have established that ROMANO and his associates distribute of oxycodone to dozens of customers in and around the North Shore of Massachusetts, including Danvers and Peabody.

13.     Over the course of this investigation, agents identified numerous individuals and the roles that certain persons have within this drug trafficking organization ("DTO"). Investigators have identified several individuals as suppliers, distributors, and users of oxycodone.  Some of these users of oxycodone have also been identified as redistributors of oxycodone pills.

14.     In 2014, investigators identified ROMANO as the DTO's primary mid-level distributor of oxycodone pills.  The evidence, including physical and court-authorized electronic surveillance (*i.e.*, wiretaps and GPS tracking devices), has established that ROMANO's oxycodone suppliers are PANARESE, PRESTERONE, and WILLIAMS.  Although each individual's role in the conspiracy varied throughout the investigation, their basic roles were as follows:  On roughly a weekly basis, ROMANO contacted PANARESE, PRESTERONE, and WILLIAMS to arrange meetings to obtain oxycodone pills for redistribution. TURNER SR., A. TURNER, S. MILBURY, and M. MILBURY were oxycodone pill customers of ROMANO who also redistributed oxycodone pills supplied by ROMANO or one of ROMANO's suppliers, such as WILLIAMS, to "street" or "retail" users of oxycodone.

## A.   *Index of Probable Cause*

15.   Probable cause for issuance of a criminal complaint and search warrants is set forth throughout this affidavit; for ease of reference, the following is a paragraph index to the principal statements of probable cause for each of the DEFENDANTS and Target Locations:

(1)   ROMANO - ¶¶ 19-25, ¶¶ 60-82 ;

(2)   PANARESE - ¶¶ 60-82;

(3)   PRESTERONE - ¶¶ 51-58; ¶¶ 83-86

(4)   WILLIAMS - ¶¶ 43-50, ¶¶ 87-95;

(5)   TURNER SR. - ¶¶ 96-104;

(6)   A. TURNER - ¶¶ 26-27, ¶¶ 96-104

(7)   S. MILBURY - ¶¶ 28-42; ¶¶ 105-117

(8)   M. MILBURY - ¶¶ 28-42, ¶¶105-117;

(9)   ROMANO residence (Target Location #1) - ¶¶ 121-122;

(10)   PANARESE residence (Target Location #2) - ¶¶ 123-124;

(11)   WILLIAMS residence (Target Location #3) - ¶¶ 125-126;

(12)   TURNER residence (Target Location #4) - ¶¶ 127-128;

(13)   MILBURY residence (Target Location #5) - ¶¶ 129-130; and

(14)   VAUGHN residence (Target Location #6) - ¶¶ 131-132.

## B.   *Title III Electronic Surveillance*

16.   On April 13, 2015, the Honorable Patti B. Saris, Chief United States District Judge, District of Massachusetts, signed an Order (hereinafter, the "April 13, 2015 Order") authorizing for 30 days the interception of wire and electronic communications to and from:

> a.   the AT&T Wireless ("AT&T") prepaid cellular phone assigned telephone number (978) 968-3291, bearing International Mobile Subscriber Identifier

7

("IMSI") 310410542943390, used by ROMANO and subscribed to "prepaid customer," with a subscriber address of 17330 Preston Road, Dallas, Texas 75252 (hereinafter, "Target Telephone #1").[2]

Pursuant to the April 13, 2015 Order, communications were intercepted from April 16, 2015, to May 15, 2015.

17.     On June 16, 2015, the Honorable Patti B. Saris, Chief United States District Judge, District of Massachusetts, signed an Order (hereinafter, the "June 16, 2015 Order"), authorizing for 30 days the interception of wire and electronic communications occurring to and from:

a.      Target Telephone #1;

b.      the SPRINT cellular phone assigned telephone number (978) 580-6814, bearing IMSI 310120100771163, used by PANARESE and subscribed to "Anthony PANARESE" with a subscriber address of 8 Moore St, Peabody, Massachusetts 01960 (hereinafter, "Target Telephone #2")[3];

c.      the SPRINT cellular phone assigned telephone number (978) 512-1001, bearing IMSI 310120100713592, used by PRESTERONE and subscribed to "Jarod PRESTERONE" with a subscriber address of 254 Walnut St, Saugus, Massachusetts 01906 (hereinafter, "Target Telephone #3")[4]; and

---

[2]  I believe that ROMANO used this telephone for the following reasons.  First, this telephone was provided to agents by a confidential source who obtained the telephone number from one of ROMANO's customers.  Second, agents monitored the confidential sources use of the telephone number to arrange controlled purchases of oxycodone pills from ROMANO.  Third, agents conducting physical surveillance have observed ROMANO travel to arranged meetings and locations consistent with intercepted communications over Target Telephone #1.

[3]  I believe that PANARESE used this telephone for the following reasons.  First, this telephone is subscribed to in PANARESE's own name.  Second, agents conducting physical surveillance have observed ROMANO travel to PANARESE's residence in a manner consistent with the intercepted communications over Target Telephone #1 and the user of this telephone.

[4]  I believe that PRESTERONE was the user of Target Telephone #3 for the following reasons.  First, Target Telephone #3 is subscribed to in PRESTERONE's name.  Second, ROMANO referred to PRESTERONE by his first name (Jarod) in an intercepted call.  Third, agents conducting physical surveillance have observed ROMANO meet with PRESTERONE in a manner consistent with the intercepted communications over Target Telephone #1 and the user of Target Telephone #3.

    d.    the Verizon Wireless cellular phone assigned telephone number (339) 203-2577 bearing Mobile Equipment Identifier ("MEID") number A0000048AAEA5A, used by ROMANO and subscribed to "Info Update" with a subscriber address of 295 Parkshore Drive, Folsome, CA 965630 (hereinafter, "Target Telephone #4").[5]

Target Telephones #1, #2, #3, and #4 will collectively be referred to as the "Target Telephones." Pursuant to the June 16, 2015 Order, communications were intercepted over the Target Telephones from June 17, 2015, to July 16, 2015.

## II.    Representative Drug Purchases, Drug Seizures, and Intercepted Communications

    18.    Over the course of this investigation, federal agents and task force officers have purchased and seized approximately 950 suspected oxycodone pills[6] that ROMANO and his associates either provided to customers (*i.e.*, a confidential source, a cooperating defendant, a cooperating witness, and an undercover agent) or held as supply to distribute to customers. From the markings on the pills, the officers who reviewed the pills concluded, based upon their training and experience, that the pills contained oxycodone.[7] Some of those controlled purchases and seizures of oxycodone pills, along with related intercepted communications, are described

---

[5] I believe that ROMANO used this telephone for the following reasons. First, ROMANO told an undercover Task Force Officer that this telephone was ROMANO's second telephone. Second, agents conducting physical surveillance have observed ROMANO travel to arranged meetings and locations consistent with intercepted communications over Target Telephone #4.

[6] Not all of the approximately 950 suspected oxycodone pills are discussed in this affidavit, as some were purchased through the use of confidential sources, but all of the suspected oxycodone pills have been submitted to the DEA Northeast Laboratory for chemical analysis and certification. To date, drug certifications are pending.

[7] There are several different manufacturers of Oxycodone tablets. From my training and experience, I know that each manufacturer is required by the FDA to place unique markings on its tablets so as to allow for ready visual identification of the pills by health care providers, patients, and law enforcement officials. The different markings combined with the product's size, shape and color make it possible to identify pills even when there is no label or prescription available. *See, e.g.,* http://www.drugs.com/article/imprint-codes.html; *see also* http://www.drugs.com/imprints.php.

herein.  Below, I also describe numerous intercepted calls and identify the participants in those calls.  Those identifications are based on a combination of several factors, including the following:  (1) intercepted statements concerning the user's location or activity that were consistent with ongoing physical or electronic surveillance; (2) identification, by name, of the users of the telephones during the intercepted communications; and (3) cell phone subscriber information.  I base my interpretations of these communications upon my training and experience, the training and experience of other investigators, and my involvement in this investigation.  Quotations from telephone conversations are based on preliminary transcripts and/or synopses ("line sheets") that are subject to revision.  All times referenced herein are approximate.

### A.    *Controlled Drug Purchases and Drug Seizures By Defendant Defendant ROMANO*

19.    This investigation began in approximately March 2014, when law enforcement officers received information from confidential sources about ROMANO and a DTO in the North Shore area of Massachusetts.  Law enforcement officers initiated investigative techniques to determine the scope of the criminal activity.  From March 2014 through February 2015, a confidential source assisted investigators by making controlled purchases of oxycodone pills from ROMANO and one of his associates.  In addition to controlled purchases of oxycodone pills, law enforcement officers conducted intense physical surveillance on ROMANO and determined that on a daily basis ROMANO left his residence to meet with individuals on isolated public roads and in parking lots parked in other cars for short meetings.  ROMANO was also seen by law enforcement completing brief stops at several residences to meet with individuals.  Based on my training and experience, I believe these brief meetings, whether in public areas or at

residences, were consistent with "street" or "retail" drug transactions. By spring 2015, investigators were able to introduce an undercover agent into the DTO and complete controlled purchases of oxycodone pills through the undercover agent directly from ROMANO.

### i.   May 8, 2015:   Undercover Task Force Officer Purchased Nine Oxycodone Pills from ROMANO

20.   On May 8, 2015, a Task Force Officer acting in an undercover capacity (hereinafter, "the UC") sent ROMANO a text message on Target Telephone #1 to request a meeting. ROMANO agreed to meet later that afternoon, at approximately 1:00 p.m. The UC asked in a text message, "Can you do 9 for $300?" ROMANO replied, "yes." ROMANO, using Target Telephone #1, and the UC then exchanged a series of phone calls and text messages to establish the meeting location and time. These communications were all intercepted pursuant to the April 13, 2015 Order. ROMANO and the UC agreed to meet at the North Shore Mall parking lot in Peabody, Massachusetts. At approximately 1:45 p.m., the UC arrived at the parking lot. ROMANO was inside his car, a Nissan Maxima bearing VIN 1N4AA5AP2EC470049 and Massachusetts registration 1NE463, which is registered to ROMANO (hereinafter, "ROMANO's car"),[8] and parked in the area of the P.F. Chang's Restaurant. The UC parked next to ROMANO's car and then entered the passenger side of ROMANO's vehicle. ROMANO provided the UC with an unmarked prescription bottle containing 9 oxycodone pills. In exchange for the tablets, the UC provided ROMANO with $300 in U.S. currency. After the brief exchange, ROMANO advised the UC to call him anytime. The UC then got out of ROMANO's car, got back into the UC's vehicle, and departed.

---

[8] A court-authorized GPS tracking device was installed on ROMANO's car in November 2014.

### i.    *May 28, 2015:    Undercover Task Force Officer Purchased Nine Oxycodone Pills from ROMANO*

21.    On May 28, 2015, the UC sent a series of text messages to ROMANO on Target Telephone #1 to request a meeting.  The UC later received a phone call from ROMANO, who was using Target Telephone #4.  In this call, ROMANO informed the UC that Target Telephone #4 was his second phone and that Target Telephone #1 was not working.  In the call, ROMANO agreed to provide the UC with nine oxycodone pills for $300.  ROMANO instructed the UC to go to the parking lot of a Dunkin Donuts located on Lowell Street in Peabody, Massachusetts.

22.    At approximately 2:20 p.m. on May 28, 2015, the UC arrived at the Dunkin Donuts parking lot as directed by ROMANO.  The UC was equipped with a recording device, but due to an equipment malfunction, the interaction between the UC and ROMANO was not recorded.

23.    ROMANO pulled into the parking lot immediately after the UC arrived. ROMANO parked next to the UC's car.  The UC exited her car and entered the passenger side of ROMANO's car.  Once in ROMANO's car, the UC handed ROMANO $300 in U.S. currency. In return, ROMANO handed the UC a small white folded piece of paper containing nine oxycodone pills.

24.    ROMANO informed the UC that he was going to be going out of town for nine days to Myrtle Beach, South Carolina, and that he had a woman named "Ashley" who was going to be working for him that week.  ROMANO provided the UC with telephone number (978) 210-3057 (hereinafter, the "A. TURNER Telephone") as the contact number for "Ashley."[9]

---

[9]  I believe that A. TURNER was the user of this telephone number for the following reasons. First, this telephone number is subscribed to in A. TURNER's name.  Second, ROMANO provided this telephone number to the UC and informed the UC that the user of this telephone number was "Ashley," which is A. TURNER's first name.  Third, the UC called this number,

25.    The UC then asked ROMANO if she needed to call ROMANO prior to calling A. TURNER. ROMANO explained it was unnecessary to contact him because A. TURNER would know that the UC was a customer. ROMANO also informed the UC that she could continue using Target Telephone #4 to contact ROMANO. The UC exited ROMANO's car, went back to her car, and departed the area.

### Defendant A. TURNER

26.    Through court-authorized intercepted telephone communications, investigators learned that A. TURNER was one of ROMANO's regular oxycodone pill customers, and that A. TURNER placed oxycodone pill orders with ROMANO for redistribution of oxycodone pills. As noted above, when investigators learned that ROMANO had instructed A. TURNER to continue his oxycodone pill distribution business during his absence, in late May and early June 2015, investigators arranged to make controlled purchases of oxycodone pills from A. TURNER. In doing so, investigators obtained further evidence of the drug conspiracy and its participants.

### i.    June 2, 2015: A. TURNER Sold 10 Oxycodone Pills To An Undercover Task Force Officer From A. TURNER's Residence

27.    For example, on June 2, 2015, the UC used the telephone number for A. TURNER provided by ROMANO to exchange a series of text messages with A. TURNER, which culminated in A. TURNER agreeing to meet with the UC and sell the UC 10 oxycodone pills for $350. A. TURNER directed the UC to meet her at the address of the residence shared by TURNER SR. and A. TURNER, i.e., Target Location #6. Later that same day, the UC met with A. TURNER at the address (Target Location #6) and purchased 10 oxycodone pills from A. TURNER at the agreed-upon price. The UC was equipped with a recording device, which

arranged to meet with A. TURNER, and ultimately purchased oxycodone directly from A. TURNER.

recorded audio between A. TURNER and the UC. Additionally, at a debriefing meeting the UC

corroborated the events that were audio recorded between the UC and A. TURNER.

### Defendants S. MILBURY & M. MILBURY

28. Law enforcement officials also learned, through court-intercepted

communications, that ROMANO distributed oxycodone pills to other customers who engaged in

the redistribution of oxycodone pills as a source of illicit income. For example, S. MILBURY

and M. MILBURY, as described below, used ROMANO as their source of oxycodone pills and

redistributed or "middled" some of the oxycodone pills they purchased to their own customers.

Based on my training and experience, I have learned that the "middle" person is the connection

between a supplier and another customer. The "middle" person benefits from the transaction by

earning money or obtaining extra narcotics for redistributing drugs.

> i. *June 26, 2015: Officers Seized 50 Oxycodone Pills From A Customer Of S. MILBURY And M. MILBURY*

29. On June 26, 2015, at approximately 1:54 p.m., ROMANO was intercepted over

Target Telephone #4 speaking with M. MILBURY, who was using (978) 836-8331 (hereinafter

the "M. MILBURY Telephone.")[10] During this call, ROMANO asked, "All right. How many

do you want?" M. MILBURY replied, "Here's the thing . . . Do you have 60 on you?"

ROMANO said, "Do I have what? 60?" M. MILBURY answered affirmatively. ROMANO

then said, "I'd have to go get them. Is that what you want?" M. MILBURY said, "Yeah."

ROMANO asked, "You want 60 right now?" M. MILBURY replied, "Yeah. Well, like, I can

wait if you want." ROMANO responded, "No. I mean I can go get them. I'll just turn around

---

[10] I believe that M. MILBURY was the user of this telephone number for the following reasons. First, this telephone number is subscribed to in M. MILBURY's name. Second, investigators were able to establish surveillance on M. MILBURY consistent with information conveyed through intercepted communications.

and go get them.  Let me go make a call and I'll call you right back."  M. MILBURY said, "All right, I wouldn't mind having a couple right now just because of this mess and then I'll give you the money and you can go get them or whatever."

30.     Based on my training and experience, as well as my participation in this investigation, I believe that, in this call, M. MILBURY asked ROMANO for 60 oxycodone pills (*"Do you have 60 on you?"*).  After determining whether M. MILBURY wanted the pills immediately, ROMANO informed M. MILBURY that he would need to make a call and go get the pills (*"I'll just turn around and go get them.  Let me go make a call and I'll call you right back."*).

31.     After this call, at approximately 1:55 p.m., ROMANO sent a text message from Target Telephone #4 to PANARESE on to (413) 301-4412, which is an additional telephone used by PANARESE ("PANARESE Telephone #2")[11] that stated, "What time u home 2day[.]" Approximately one minute later, at approximately 1:56 p.m., PANARESE used PANARESE Telephone #2 to call ROMANO on Target Telephone #4.  During this call, PANARESE informed ROMANO that he would "be home in 5 minutes."  ROMANO replied, "Alright, perfect.  I'm gonna come, ahh, I'm gonna come see ya.  I'm gonna, ahh, I got the money on me and I need like another 50."  PANARESE said, "Okay . . . I'm on."  ROMANO stated, "Alright. I'll be by."

32.     Based on my training and experience, as well as my participation in this investigation, I believe that, in these intercepted communications, ROMANO advised

---

[11]   I believe that PANARESE is the user of this telephone number for the following reasons. First, ROMANO refers to this telephone number in an intercepted call as PANARESE's second telephone number.  Second, agents conducting physical surveillance have observed ROMANO meet with PANARESE in a manner consistent with the intercepted communications over Target Telephone #4 and the user of this telephone number.

PANARESE that he had cash on hand and needed to buy 50 oxycodone pills (*"I got the money on me and I need like another 50."*).   PANARESE said that he would be at his residence, and ROMANO said he would stop by.

33.    That afternoon, at approximately 2:01 p.m., data from the court-authorized GPS tracking device attached to ROMANO's car indicated that, after speaking with PANARESE, ROMANO drove his car to the vicinity of the MILBURY residence, Target Location #5. According to the GPS tracking data, ROMANO's car was near the MILBURY residence, Target Location #5, for approximately 16 minutes and left at approximately 2:17 p.m.

34.    That same afternoon, data from the court-authorized GPS tracking device attached to ROMANO's car indicated that ROMANO's car was near PANARESE's residence, Target Location #2, arriving at approximately 2:57 p.m.   ROMANO's car was near PANARESE's residence, Target Location #2, for approximately 17 minutes, departing at approximately 3:14 p.m.  Based on my training and experience, as well as my participation in this investigation and interpretation of the earlier intercepted communications between ROMANO and PANARESE, I believe ROMANO obtained additional oxycodone pills from PANARESE and thus, PANARESE stores records of drug transactions at Target Location #2.

35.    At approximately 3:35 p.m., that same day, ROMANO used Target Telephone # 4 to call M. MILBURY's Telephone.  ROMANO told M. MILBURY, "I'm on my way back by there."   ROMANO asked, "Do you want the last?"   M. MILBURY answered affirmatively. ROMANO asked, "You want to run out?  You want me to run in?  What do you want me to do?" M. MILBURY replied, "Let me run out just because the baby is sleeping."  ROMANO said, "No, that's fine.  Alright.  You just want me to call you?  What you want me to do?"  M. MILBURY said, "Yeah.  Text me when you're here."  ROMANO informed M. MILBURY,

"I'm gonna give you six. You're gonna give me $180. I gave you 54, you gave me $1,500."

36.     Based on my training and experience, I believe that, in this intercepted call, ROMANO informed M. MILBURY that he was returning to M. MILBURY's residence (*"I'm on my way back by there"*) and sought confirmation that M. MILBURY wanted the rest of the pills for her order of 60 oxycodone pills (*"Do you want the last?"*).   ROMANO told M. MILBURY that he would provide her with an additional 6 pills to complete the order and M. MILBURY owed ROMANO an additional $180.   ROMANO explained that he had previously provided M. MILBURY with 54 pills and that M. MILBURY had previously given ROMANO $1,500 (*"I'm gonna give you six. You're gonna give me $180. I gave you 54, you gave me $1,500."*).   I also believe, based on this conversation that during the first visit described above ROMANO provided M. MILBURY with 54 oxycodone pills and then returned for a second visit to provide her with six additional oxycodone pills.

37.     Later that afternoon, at approximately 3:49 p.m., an officer conducting surveillance saw ROMANO's car arrive and park at the MILBURY residence, Target Location #5.   Four minutes later, at approximately 3:53 p.m., an officer saw ROMANO's car leave the MILBURY residence.   I believe this short visit was consistent with the previously-intercepted communication in which ROMANO agreed to drop off an additional six oxycodone pills for M. MILBURY.   Later that evening, at approximately 8:33 p.m., S. MILBURY used telephone number (978) 335-2410 (hereinafter, the "S. MILBURY Telephone")[12] to send ROMANO a text message on Target Telephone #4 confirming the transaction that read, "You set him up? 55 or

---

[12]   I believe that S. MILBURY is the user of this telephone number of the following reasons. First, this telephone number is subscribed to in S. MILBURY's name.   Second, ROMANO referred to S. MILBURY by his first name (Sans) in an intercepted call.   Third, agents conducting physical surveillance have observed ROMANO meet with S. MILBURY in a manner consistent with the intercepted communications over Target Telephone #1 and the user of this telephone number.

60?" ROMANO replied "55."

38.     After the transaction between M. MILBURY and ROMANO, officers continued to conduct surveillance on the MILBURY residence and, at approximately 3:58 p.m., they saw a grey sedan arrive at the MILBURY residence.

39.     Two minutes later, at approximately 4:00 p.m., the same car left the residence. Because of the brief stop at the MILBURY residence, as well as the previous intercepted communications indicating that ROMANO had just delivered oxycodone pills to M. MILBURY, officers conducting surveillance believed that the grey sedan was likely driven by an oxycodone customer of M. MILBURY. After observing motor vehicle violations, a law enforcement officer stopped the vehicle on Route 128 in Peabody, Massachusetts. The officer conducted a search of the vehicle and recovered 50 oxycodone pills.[13] The driver of the grey sedan was arrested and transported to the State Police Barracks in Danvers, Massachusetts for booking.

40.     At the Barracks, the driver (hereinafter, "Cooperating Witness-1" or "CW-1") agreed to speak with law enforcement officers about the oxycodone pills recovered from the vehicle. CW-1 agreed to do this in an effort to help reduce bail and mitigate any potential charges filed against CW-1. CW-1 said that the pills belonged to CW-1 and were for personal use, not for redistribution. CW-1 told the officers that CW-1 used several pills a day for approximately seven years. When asked who sold CW-1 pills, CW-1 stated that the people from whom CW-1 purchased the pills got the pills from another source, and that the people CW-1 purchased from just "middled" the transaction.

41.     CW-1 identified CW-1's source for pills as S. MILBURY and provided the S.

---

[13] The pills that were seized from CW-1's vehicle have been submitted to the DEA's Northeast Laboratory and are pending chemical analysis. Based upon my training and experience, the markings on the pills, and my participation in this investigation, I believe that the pills contain oxycodone.

MILBURY Telephone as the telephone number used to contact S. MILBURY. CW-1 stated that CW-1's communications with S. MILBURY occurred via text messages through the use of an iPhone.[14] CW-1 also told officers that, on June 26, 2015, S. MILBURY directed CW-1 to obtain the oxycodone pills from S. MILBURY's wife, whom CW-1 knew as "Marcy."

42.    CW-1 explained that CW-1 first made contact with S. MILBURY to obtain oxycodone pills that day. S. MILBURY was not available and directed CW-1 to meet with S. MILBURY's wife to complete the transaction. CW-1 began receiving text messages from "Marcy." CW-1 stated that CW-1 purchased 50 oxycodone pills and paid "MARCY" $30 per pill. CW-1 stated that CW-1 went to the MILBURY's residence and purchased the pills from "Marcy," who came out of the house and conducted the sale in the driveway. CW-1 explained, however, that on previous transactions CW-1 met with S. MILBURY and that S. MILBURY typically needed to hurry back to pay S. MILBURY's source. CW-1 stated that the locations where CW-1 and S-MILBURY met for previous oxycodone pill purchases varied from Burlington to the Woburn area.

### Defendant WILLIAMS

43.    Through court-authorized intercepted telephone communications, investigators learned that ROMANO obtained some of his supply of oxycodone pills through WILLIAMS.

---

[14] Toll records for CW-1 Telephone and the S. MILBURY Telephone do not contain records of SMS text messages, however, based on my prior experience I know that text messages between iPhone to iPhone users are not noted in toll records and are instead classified as iMessages. CW-1 informed law enforcement officers that CW-1 routinely deleted text messages and iMessages from CW-1's iPhone in the event that CW-1's spouse checked CW-1's iPhone.

#### *i. July 1, 2015: ROMANO Obtained Oxycodone Pills From WILLIAMS And Then Sold 40 Oxycodone Pills To An Undercover Task Force Officer*

44.     On July 1, 2015, at approximately 11:53 a.m., the UC placed a call to ROMANO on Target Telephone #4. The UC advised ROMANO that the UC was putting money together and asked ROMANO how many oxycodone pills she could get for $1,200. ROMANO told the UC that she could purchase 40 pills for that amount. The UC informed ROMANO that a portion of the money was coming from the UC's friend and asked if ROMANO would come to Malden to deliver the pills. ROMANO agreed to go to Malden. The UC informed ROMANO that she would update him after she had collected the $1,200. At approximately 11:54 a.m., the UC sent ROMANO a text message, which stated, "It's Rachel. Call me back I got money just cashed my check[.]"

45.     Soon after, at approximately 11:55 a.m., ROMANO used Target Telephone #4 to call WILLIAMS on (857) 417-1918 (hereinafter, the "WILLIAMS Telephone").[15] ROMANO stated, "This guy wants half pack, want me to get it?" WILLLIAMS replied, "Yeah. Uh, um, can you come to Malden?" ROMANO and WILLIAMS agreed to meet.

46.     Based on my training and experience, as well as my participation in this investigation, I believe that ROMANO in this call informed WILLIAMS that ROMANO had a customer who wanted 50 oxycodone pills (*"This guy wants half pack"*). ROMANO offered to

---

[15]  I believe that WILLIAMS is the user of this telephone number for the following reasons. First, WILLIAMS was identified as the user of the WILLIAMS Telephone by ROMANO during intercepted communications in which ROMANO identified the caller as "Paul", *i.e.*, WILLIAMS's first name. Second, through intercepted communications, investigators were able to establish surveillance on WILLIAMS consistent with information conveyed in the intercepted communications.

meet WILLIAMS ("*want me to get it?*"), and WILLIAMS asked him to drive to Malden, Massachusetts.

47.     At approximately 12:32 p.m. that same day, ROMANO used Target Telephone #4 to send a text message to the UC asking, "what time you think[?]" The UC replied, "She's cashing check now and I'm meeting her in 30. I'll call you as soon as I get her money[.]"

48.     At approximately 1:05 p.m. on July 1, 2015, the UC sent a text message to ROMANO on Target Telephone #4 that said, "I got 1200. Let me know where on Broadway to meet you." ROMANO replied, "K."

49.     At approximately 1:11 p.m. on July 1, 2015, officers conducting surveillance saw ROMANO leave the ROMANO residence, Target Location #1, and drive ROMANO's car into the city of Everett, Massachusetts. At the same time investigators saw WILLIAMS at City Hall in Everett filing permits. At approximately 1:38 p.m., officers saw ROMANO park his car on Church Street in Everett near Everett City Hall. ROMANO got out of his car and walked in the direction of Everett City Hall. Officers then saw ROMANO walk back to his vehicle with WILLIAMS. Officers saw ROMANO and WILLIAMS exchange items in a manner that they believed, based upon their training and experience, was consistent with a drug transaction. Officers then observed ROMANO walk back to his car, enter the driver's side, and drive away from the area. Officers also observed WILLIAMS enter his Mercedes SUV bearing VIN 4JGBF71E57A188315 and Massachusetts Registration number 4YBR70 (hereinafter, "WILLIAMS's car") and drive away from the area.

50.     At approximately 1:52 p.m., that same day, ROMANO used Target Telephone #4 to send a text message to the UC that said, "I Am in traffic almost there[.]" At approximately 2:00 p.m., ROMANO arrived in the Lowes Hardware parking lot on Route 99 in Saugus,

Massachusetts. At approximately 2:01 p.m., the UC entered ROMANO's car. While in the car, the UC provided ROMANO with $1,200 in U.S. currency. In return, ROMANO provided the UC with 40 suspected oxycodone pills. The UC then exited ROMANO's car, and both departed company.

### Defendant PRESTERONE

51.     Through court-authorized intercepted communications, investigators learned that ROMANO also redistributed oxycodone sold to him by PRESTERONE. Subsequently, as noted above, in June 2015 investigators obtained judicial authorization to intercept Target Telephone #3 used by PRESTERONE. Additionally, in June 2015, investigators installed a court-authorized GPS tracking device on PRESTERONE's white Infiniti Q50 bearing VIN JN1BV7AR3EM696193 and Massachusetts registration 492VZ2 (hereinafter, "PRESTERONE's car") which further assisted investigators in conducting surveillance on PRESTERONE.

> i. *July 6, 2015:  Law Enforcement Officers Seized Approximately 570 Oxycodone Pills From PRESTERONE's Car*

52.     On July 6, 2015, beginning at approximately 9:59 a.m. and continuing for the next ten minutes, PRESTERONE used Target Telephone #3 to send a series of text messages to a telephone number with a New York City-based area code (917) in which PRESTERONE stated that he "gutta shoot down to city today" at approximately "3-3:30" for a quick trip and inquired whether the user of the phone was available "to meet me in the city for a quick bite." PRESTERONE further stated that he was "not stayin." At approximately 12:03 p.m. that same day, data from a court-authorized GPS tracking device installed on PRESTERONE's car indicated that PRESTERONE had departed from the area of his residence at 100 Main St Unit #3, Stoneham, Massachusetts and was heading south on Route 95. These text messages, combined with the GPS data, led investigators to believe that PRESTERONE was heading to

New York City, New York, to obtain a new supply of oxycodone pills.

53.     Officers conducting surveillance followed PRESTERONE's car to New York City. At approximately 4:20 p.m., officers saw PRESTERONE's car unoccupied on West 14th Street between 9th Avenue and 10th Avenue, New York, New York. At approximately 4:51 p.m., PRESTERONE received an incoming call on Target Telephone #3 from telephone number (201) 927-3237. PRESTERONE told the user of the telephone number, "I gotta get back to my house," which investigators believed, based on what they learned during this investigation, meant that PRESTERONE would return to his residence in Massachusetts once he was resupplied with oxycodone pills.

54.     At approximately 5:15 p.m., officers saw PRESTERONE on 14th Street near 10th Avenue talking with an unknown male (hereinafter, "UM-1") wearing sun glasses and a white tee shirt. Surveillance officers then saw PRESTERONE and UM-1 enter a black Chevrolet Tahoe with livery license plates. Officers followed the Tahoe to the area of Bleecker Street and West 6th Street, where they saw PRESTERONE and UM-1 exit the Tahoe. Officers lost sight of PRESTERONE and UM-1 shortly after they exited the Tahoe.

55.     At approximately 6:00 p.m., officers saw PRESTERONE and a second unknown male (hereinafter, "UM-2") wearing a white tee shirt and jeans cross West 14th Street and walk to the rear of PRESTERONE's car. PRESTERONE was seen carrying a small black bag that had not been previously seen by officers conducting surveillance. Officers then saw PRESTERONE open his car's trunk, remove a beach chair from the trunk, search deep into the trunk as if he were hiding something in the back of the trunk and place the small black bag into the trunk. Based on my training and experience, as well as my participation in this investigation, PRESTERONE's actions with respect to the small black bag were consistent with the actions

23

taken by drug traffickers who attempt to hide drugs or drug proceeds in the trunk of a car to avoid detection.

56.    After closing the trunk, PRESTERONE and UM-2 then walked down West 14th Street towards 9th Avenue.  At approximately 7:40 p.m., PRESTERONE returned to his car alone, opened the car's trunk, and removed the same black bag that PRESTERONE had placed in the trunk earlier.  PRESTERONE then entered the driver's side of his car carrying the small black bag and drove away.  Officers followed PRESTERONE as he began driving back to Massachusetts.

57.    At approximately 10:30 p.m. that same evening, two Massachusetts State Police troopers stopped PRESTERONE's car on Route 84 in Sturbridge, Massachusetts, after observing a series of traffic violations, including a marked lane violation, following too close, and texting while driving.  During the stop, the troopers questioned PRESTERONE and requested consent to search the car.  PRESTERONE voluntarily gave verbal consent to the search.  During the stop, the troopers seized two bags containing approximately 570 suspected oxycodone pills hidden in a weight vest (a gym or training equipment item used for working out), which was under a beach chair in the rear of the vehicle's trunk.

58.    The troopers questioned PRESTERONE about the two bags of oxycodone pills.  PRESTERONE said that he never saw the pills before and informed the troopers that several people had used the weight vest.  The troopers told PRESTERONE that they were going to seize the two bags of suspected oxycodone pills.  PRESTERONE was given a written warning for motor vehicle violations and permitted to drive away.

**B.      Intercepted Communications and Surveillance Evidencing Drug Conspiracy and Drug Transactions**

59.      In addition to the controlled purchases and seizures of oxycodone pills, as described in Section II. A. of this affidavit, investigators have also gathered evidence through court-authorized intercepted communications on the Target Telephones and surveillance to corroborate the drug conspiracy and drug transactions completed by the DEFENDANTS.  Some, but not all, of the drug transactions are detailed below.

*Defendants ROMANO & PANARESE*

> *i.       April 17, 2015:   ROMANO Obtained 100 Oxycodone Pills From PANARESE At PANARESE's Residence (Target Location #2)*

60.      On April 17, 2015 at approximately 6:15 p.m., ROMANO placed a call from Target Telephone #1 to Target Telephone #2, which was used by PANARESE.  ROMANO said, "Can I come by for one pack?"  PANARESE replied, "Yeah."  ROMANO then said, "Alright. Bye.  Coming right now."  Based on my training and experience, as well as my participation in this investigation, I believe that ROMANO asked if PANARESE was available to distribute oxycodone (*"can I come by"*) and if PANARESE would distribute 100 pills of oxycodone (*"one pack"*) to ROMANO.  Based on information obtained from the court-authorized GPS tracking device installed on ROMANO's car, investigators determined that ROMANO's car was in the area of PANARESE's residence, Target Location #2, following the above-mentioned phone calls.  As a result, I believe ROMANO and PANARESE met at PANARESE's residence to collect oxycodone pills.  Based on this event and the facts revealed by this investigation, I believe PANARESE stores drugs, illicit proceeds from drugs, and records of his narcotics transactions in Target Location #2.

### i.   *April 19, 2015:   ROMANO Obtained 40 Oxycodone Pills From PANARESE At PANARESE's Residence*

61.    On April 19, 2015, at approximately 5:33 p.m., ROMANO placed a call from Target Telephone #1 to PANARESE on Target Telephone #2. ROMANO said, "You want me to grab forty? I got enough for forty." PANARESE responded, "Yeah, that's fine. Where you at?" ROMANO then said, "I don't know what I got enough for, got like $900 on me if you want it." PANARESE replied, "Yeah that's fine, I'll open up. When you gonna be here?" ROMANO said "I'm coming down Route 1 right now." Based on my training and experience, as well as my participation in this investigation, I believe that during this call ROMANO arranged to go to PANARESE's residence to pick up 40 oxycodone pills, and that ROMANO offered to give PANARESE $900 for the pills. Based on information obtained from the court-authorized GPS tracking device installed on ROMANO's car, investigators determined that ROMANO's car was in the area of PANARESE's residence following the above-mentioned phone call and thus, I believe ROMANO and PANARESE met at PANARESE's residence, Target Location #2, so that PANARESE could distribute oxycodone pills to ROMANO.

### iii.   *April 21, 2015: ROMANO Dropped Off Oxycodone Proceeds At PANARESE's Residence (Target Location #2)*

62.    On April 21, 2015, at approximately 4:51 p.m., ROMANO placed a call from Target Telephone #1 to PANARESE on Target Telephone #2. ROMANO said, "Alright just, um, call me when you get home I got another dime right now." PANARESE then said, "You got, you got rid of something?" ROMANO said, "I got another dime, or maybe like eleven hundred." PANARESE responded, "OK, I'll call you right when I'm getting out of here." Based on my training and experience, as well as my participation in this investigation, I believe that ROMANO discussed dropping off drug proceeds to PANARESE at Target Location #2 (*"I*

*got another dime right now."*)   Based on my training and experience in this and other investigations, the term "dime" is a reference to $1,000.

63.     At approximately 6:54 p.m. on April 21, 2015, investigators conducting surveillance on PANARESE saw PANARESE arrive at his residence (Target Location #2) driving an Acura bearing VIN 19UYA41673A000118 and Massachusetts registration 342JP4 ("PANARESE's car").   At approximately 6:55 p.m., investigators saw ROMANO arrive at PANARESE's residence driving his car.  ROMANO parked in front of the residence (Target Location #2) and walked into PANARESE's residence.  Shortly thereafter, at approximately 7:02 p.m., investigators saw ROMANO walk out of the residence and drive away from PANARESE's residence.   Based on my training and experience, I believe that ROMANO then paid drug proceeds to PANARESE inside Target Location #2 as they had discussed on the intercepted calls described above.

    *iv.*    ***April 23, 2015:  ROMANO Discussed With A Customer Making And Storing Drug Ledgers That ROMANO Updated At The End Of Each Day***

64.     On April 23, 2015 at approximately 3:23 p.m., ROMANO used Target Telephone #1 to make an outgoing call to Richard York ("York"), believed to be an oxycodone customer, using (978) 327-9996.[16]   During the call ROMANO and York discussed the amount of oxycodone pills ROMANO previously supplied to York.  Specifically, ROMANO stated, "Yeah I gave you six over [TURNER, SR.'s] house remember, first you were gonna take eight then you took six".  York replied, "No you gave me four, no I'm sorry five."  ROMANO then responded, "No, I gave you six."  To which York said, "You gave me two of those things.  You said try then three of the other things."  ROMANO replied, "No I didn't.  I gave you six pills dude I gave you

---

[16]  I believe that York is the user of this telephone number because he is listed at the telephone number's subscriber.

six pills. I got it written down . . . I got it written down on a piece of paper . . . I'll even show you on a piece of paper. I write it down every time I go home, what I give people."

65.     Based on my training and experience, as well as my participation in this investigation, I believe that in the intercepted telephone communication between ROMANO and York, they discussed the amount of oxycodone pills ROMANO had distributed to York (*"you gave me 2 of those things. . . . I gave you 6 pills dude[.]"*). ROMANO stated that he made notes on a nightly basis when he returns to his residence, Target Location #1, documenting the amount of oxycodone pills he distributed to his customers (*"I gave you 6 pills I got it written down. . . . I got it written down on a piece of paper . . . I'll even show you on a piece of paper. I write it down every time I go home, what I give people."*). In my experience with other drug investigations, and through my discussions with experienced investigators, I am aware that drug traffickers such as ROMANO often maintain ledgers and records of the quantity of drugs they purchase from their suppliers and distribute to their customers.

     *v.*     ***April 26, 2015 Through April 27, 2015:   ROMANO Dropped Off Oxycodone Proceeds At PANARESE's Residence (Target Location #2)***

66.     On April 26, 2015, between 3:51 p.m. and 3:57 p.m., ROMANO used Target Telephone #1 and PANARESE used Target Telephone #2 to exchange text messages with each other. ROMANO texted, "Can I drop seven hundred off tonight or in the morning so I can just take them all I will be up early I have eighteen hundred?" PANARESE responded, "That's fine, can u drop off rest in the morn?" ROMANO then texted, "Ya absolutely the kid is getting clean so I am calling it a day and back to work in the morning I will call you tomorrow but yes I will put the seven hundred in there for you when you get home tomorrow." Based on my training and experience, as well as my participation in this investigation, I believe that ROMANO and PANARESE discussed ROMANO's desire to drop off drug proceeds to PANARESE (*"Can I*

*drop seven hundred off tonight[?]*") and to pick up more oxycodone pills from PANARESE at Target Location #2 ("*so I can just take them all*").

67.    On April 27, 2015, at approximately 3:26 p.m., ROMANO used Target Telephone #1 to call PANARESE on Target Telephone #2.  During that conversation, ROMANO said, "I don't need many, but I'm out and about now[.]"  PANARESE responded, "All right I'll see you in a few."  At approximately 3:54 p.m., investigators conducting surveillance saw ROMANO park in the driveway of PANARESE's residence in Peabody, Massachusetts.  At approximately 4:00 p.m., investigators saw ROMANO walk from PANARESE's residence to his car and depart the area.  Based on my training and experience, as well as my participation in this investigation, I believe that during this conversation, ROMANO and PANARESE discussed ROMANO's desire to collect pills from PANARESE ("*I don't need many, but I'm out and about now.*").  I believe that ROMANO contacted PANARESE to pick up more oxycodone pills to distribute from PANARESE's residence, Target Location #2 ("*All right I'll see you in a few*").

### vi.    *June 19, 2015:  ROMANO Obtained 100 Oxycodone Pills From PANARESE For Distribution*

68.    On June 19, 2015, at approximately 9:35 a.m., ROMANO used Target Telephone #4 to send an outgoing text that stated, "B Home at 7 can u b home i need over a pack," to PANARESE Telephone #2.  At approximately 11:34 a.m., PANARESE used PANARESE Telephone #2 to call ROMANO on Target Telephone #4.  ROMANO said, "Hey, What's up?  Umm, you'll be home like seven, eight o'clock, right?"  PANARESE answered, "Ya, tonight, ya."  ROMANO then said, "If you happen to go out, just leave a package, alright?  I got the money.  But try not to go out.  OK?"  PANARESE replied, "I'll be home."

69.    Based on my training and experience, as well as my participation in this investigation, I believe that the intercepted communications between ROMANO and

PANARESE concerned ROMANO's desire to obtain 100 oxycodone pills ("*a pack*") from PANARESE at Target Location #2. Data from the court-authorized GPS device installed on Romano's vehicle confirmed that ROMANO's car traveled to the vicinity of PANARESE's residence at approximately 5:22 p.m. on June 19, 2015, thus leading me to conclude that ROMANO successfully acquired the 100 oxycodone pills from PANARESE.

### vii.   *July 2, 2015: PANARESE Had A Dwindling Supply Of Oxycodone Pills At His Residence (Target Location #2) And Was Awaiting A New Supply From His Supplier*

70.    On July 2, 2015, at approximately 1:14 p.m., PANARESE used PANARESE Telephone #2 to call ROMANO on Target Telephone #4. During the telephone conversation, PANARESE said, "I just talked to the spic. ... He said it should be going down tomorrow at like 6 o'clock at night. I said, 'All right dude.' That would be fucking amazing if it happened, ya know? If it doesn't happen, we're fucked..." ROMANO replied, "I know. I know. I got Jay's girl some, but I got them from the other guy because I give them to her for 25 bucks. . . . I'm getting nervous." PANARESE then said, "I got you. See what I have, I have probably 400 at the house anyway." To which ROMANO replied, "Oh, you have that many?" PANARESE responded, "I think so. Maybe 300 right now. But it should be around there. If he comes through tomorrow, it doesn't even matter." ROMANO then said, "Ya, I just hope it happens. I get nervous with him. He's reliable, and then all of a sudden he disappears. PANARESE replied "He's not white." ROMANO responded, "I know he's not white[.] . . . They just have no concept of being on point or on time."

71.    Based on my training and experience, as well as my participation in this investigation, I believe that in this call PANARESE told ROMANO that a Hispanic male (based on the use of the derogatory term *"spic"* and noting that *"he's not white"*) informed

PANARESE that he would have more oxycodone pills the next evening (*"it should be going down at like 6 o'clock"*). PANARESE was hopeful that he would receive more pills soon (*"that would be fucking amazing if it happened"*) as he was running low on pills (*"if it doesn't happen tomorrow, we're fucked"*). ROMANO also expressed concern about the dwindling amount of oxycodone pills they had available to distribute (*"I'm getting nervous"*). PANARESE estimated that he only had 300 to 400 pills left at his house (*"I have probably 400 at the house ... maybe 300 right now, but it should be around there"*), which he believed would satisfy demand if the Hispanic male appeared on schedule (*"If he comes through tomorrow, it doesn't even matter"*). As such, this information again leads me to believe that PANARESE keeps drugs, drug proceeds, and records of drug transactions at his residence, Target Location #2.

### viii.  *July 7-8, 2015:  PANARESE Moved Oxycodone Pills From Target Location To Eric VAUGHN's Residence (Target Location #6) For Storage*

72.  On July 7, 2015, based on intercepted telephone calls, investigators learned that officers conducting surveillance on and stationed near the PANARESE residence were identified as law enforcement officers by Jeremy Panarese (hereinafter, "J. Panarese"), PANARESE's brother.  Based on a review of intercepted telephone calls on Target Telephone #2 used by PANARESE, investigators learned that J. PANARESE contacted PANARESE, told PANARESE that law enforcement officers were conducting surveillance on the PANARESE residence, Target Location #2, and warned him to discontinue any criminal activities to avoid detection.  As described below, investigators also learned through intercepted telephone calls on Target Telephone #2 that, because of J. PANARESE's warning, PANARESE contacted VAUGHN for assistance in relocating his supply of oxycodone pills.

73.  Later in the afternoon, on July 7, 2015, at approximately 5:16 p.m., PANARESE

used Target Telephone #2 to call (978) 210-7614 used by VAUGHN (hereinafter, VAUGHN's Telephone")[17] and said, "Can I swing by your house in a little bit?" VAUGHN answered, "Yea, why what's up?" PANARESE responded "Nothing, I'll call, I'll give you a ring first . . . Can you call my other phone?" VAUGHN responded, "Yea, I just called it a little while ago. You didn't answer it." At approximately 6:55 p.m., PANARESE used Target Telephone #2 to place an outgoing call to the VAUGHN Telephone. During that conversation, VAUGHN asked, "What does it have to do with like Manny Manolo? . . . Want me to leave it at my house? . . . Ok, alright you can tell me what it is later when I get home." PANARESE then said, "Did you put that, uh . . ." VAUGHN interrupted, "Yea, I left it home cause I didn't know what it was." PANARESE then said "alright." At approximately 9:13 p.m., PANARESE made an outgoing call from Target Telephone. # 2 to the VAUGHN Telephone. During that telephone conversation, PANARESE said, "You're all set for tonight, right?" VAUGHN responded, "I don't have anything. I've been out for like four hours. I've got people doing the fucking electric. shake." PANARESE then said, "Oh, ok, well I'm sorry that you do gotta go home." VAUGHN replied, "Oh alright, is that what it is? . . . Oh no yea, I definitely have to go home then. . . . Remember you just dropped that off at my house. I didn't even know what it was[.]"

74.     Based on my training and experience, and my participation in this investigation, I believe during the above-described telephone calls PANARESE and VAUGHN discussed oxycodone pills that PANARESE left at VAUGHN's residence. VAUGHN also asked the cause of PANARESE's problems (*"Yea, why what's up? . . . Ok, alright you can tell me what it is later*

---

[17]    I believe that VAUGHN was the user of this telephone because through intercepted communications, investigators were able to establish surveillance on VAUGHN consistent with information conveyed in the intercepted communications. Additionally, the user of this telephone self-identified as "EV," which are Eric VAUGHN's initials.

*when I get home. . . . what does it have to do with like Manny Manolo?"*). Based on information investigators have learned during the court-authorized wiretap surveillance of Target Telephone #2, I believe that the reference to "Manny Manolo" is to one of PANARESE's sources of oxycodone pills identified as "Manny." During the conversation, VAUGHN also acknowledged that he initially was not sure what was left at his residence (*"Remember you just dropped that off at my house. I didn't even know what it was[.]"*). VAUGHN also told PANARESE that he was out of pills, and that his customers were demanding pills because of their addiction (*"I've got people doing the fucking electric shake."*).

75.     The following day, July 8, 2015, at approximately 12:49 p.m. PANARESE used Target Telephone #2 to contact the VAUGHN Telephone. During the telephone conversation, PANARESE told VAUGHN, "It's just at some point I gotta see you," to which VAUGHN replied, "I mean I can stop by my house on the way over. . . . Yea you want me to bring it over?" PANARESE then said, "Yea." At approximately 12:58 p.m., that same day, VAUGHN used the VAUGHN Telephone and called PANARESE on Target Telephone # 2 and asked, "Do you think you could do me a little solid for holding these?" PANARESE answered, "Yea yea... We'll figure it out... I'll figure it out when I . . . when I . . . when I see you . . . we'll figure it out." Based on my training and experience, and participation in this investigation, I believe that the above-referenced intercepted calls confirm that VAUGHN stored oxycodone pills at his residence on behalf of PANARESE (*"I mean I can stop by my house on the way over. . . . Yea you want me to bring it over?"*) and in return VAUGHN requested compensation (*"Do you think you could do me a little solid for holding these?"*). Accordingly, based on the above-reference communications between PANARESE and VAUGHN, I believe that PANARESE used the VAUGHN residence, Target Location #6, as a stash house for his oxycodone pills.

### ix.   *July 9, 2015:  PANARESE Arranged A Meeting Between ROMANO And VAUGHN For Distribution Of Oxycodone Pills*

76.     On July 9, 2015, at approximately 12:10 p.m., PANARESE used Target Telephone #2 to call ROMANO on Target Telephone #1. PANARESE asked ROMANO if he wanted to "hook up in a little bit?" ROMANO responded, "Yeah, I might have just the right amount actually, I'm meeting someone right now for 10 more. Let's see 10 . . . I think I actually do, I think I got exactly what I owe ya. I think I'm gonna have the right exact amount. . . . Where you gonna be?" PANARESE then said, "I'm working right now but I was just trying to think . . . you know EV is holding on to 'em right now." ROMANO replied, "Yeah, you want me just to go by there? . . . You want me to go by his house?" PANARASE affirmed, "Yeah, . . . I just gotta call him and figure it out . . . I don't think it would be his house though, you know what I mean?"

77.     Based on my training and experience, and participation in this investigation, I believe ROMANO told PANARESE, in the above-reference telephone call, that he was scheduled to meet a customer to sell 10 oxycodone pills (*"I'm meeting someone right now for 10 more. Let's see 10"*) and then would have the full amount of drug proceeds that ROMANO owed to PANARESE (*"I think I got exactly what I owe ya. I think I'm gonna have the right exact amount."*). PANARESE then instructed ROMANO to meet with "EV", in reference to Eric VAUGHN because of the initials, who was storing and distributing oxycodone pills on behalf of PANARESE (*"you know EV is holding on to em right now"*) but warned that the meeting should not take place at VAUGHN's residence, Target Location #6 (*"I don't think it would be his house though you know what I mean?"*).

78.     At approximately 12:10 p.m., ROMANO received another incoming call on Target Telephone #4 from PANARESE Telephone #2. During that telephone conversation,

PANARESE told ROMANO that VAUGHN could see him "before 3:00" and ROMANO stated that he would "call him before 3:00." At approximately 1:27 p.m., ROMANO received an incoming text message from the VAUGHN Telephone, which read, "Yo, it's EV, I can leave my house in a lil bit like 20m, r, u, ready to go around then?" ROMANO responded, "Sure how about 2."

79.     At approximately 1:40 p.m., an officer conducting surveillance on VAUGHN's residence, saw VAUGHN's gray Chevrolet pick-up, bearing VIN #1GCEK14T6YZ179985 and Massachusetts Registration US79JZ (hereinafter, "VAUGHN's vehicle") parked in the driveway of the residence, Target Location #6. At approximately 1:49 p.m., ROMANO used Target Telephone #4 to send a text message to VAUGHN's Telephone, which read, "If I go out now can u c me in the next 20mins." VAUGHN responded, "Okay I can leave my house right at 2, I'll call you in 10 minutes[.]" At approximately 2:03 p.m., ROMANO received an incoming text message on Target Telephone #4 from the VAUGHN Telephone, which read, "Yes I'm getting my car in 5m ill call u." At approximately 2:04 p.m., an officer conducting surveillance on VAUGHN's residence saw VAUGHN leave VAUGHN's residence. At approximately 2:10 p.m., ROMANO used Target Telephone #4 to place an outgoing call to the VAUGHN Telephone. ROMANO asked VAUGHN, "You got those" and VAUGHN stated, "Yea." VAUGHN and ROMANO then discussed where to meet, and VAUGHN told ROMANO to go "right across from Sam's Food Mart" on "Norwich Road . . . there's like a bunch of little streets that go in and out[.] . . . We can just go right there and just like throw it . . . give it through the window real quick."

80.     Based on the intercepted calls, I set-up surveillance near the vicinity of Sam's Food Mart. At approximately 2:18 p.m., I saw ROMANO drive his car up Norwich Road from

Lowell Street, and then I saw VAUGHN pull out of a parking lot drive up Norwich Road directly behind ROMANO's car. At approximately 2:19 p.m., I saw VAUGHN drive his vehicle back down Norwich Road with ROMANO's car following directly behind and then saw both vehicles drive in separate directions. Based on my training and experience, and involvement in this investigation, I believe that VAUGHN and ROMANO completed a drug transaction of oxycodone pills, as they discussed during their telephone conversation prior to their meeting (*"you got those"*). They then quickly met in a public area to complete the transaction while in their respective vehicles (*"[w]e can just go right there and just like throw it . . . give it through the window real quick."*). I also believe that VAUGHN had stored the oxycodone pills he delivered to ROMANO at his residence, Target Location #6, as noted by PANARESE, who set up the meeting between VAUGHN and ROMANO, (*"you know EV is holding on to em right now"*). Indeed, the officer conducting surveillance on VAUGHN did not see him stop at any other location between Target Location #6 and his meeting with ROMANO, and VAUGHN confirmed that he left his home before meeting with ROMANO (*"Okay I can leave my house right at 2[.]"*).

x.   **July 13, 2015: PANARESE Told VAUGHN That He Continued To Maintain A Small Quantity of Oxycodone Pills At His Residence (Target Location #2**

81.    On July 13, 2015, at approximately 5:24 p.m., VAUGHN called PANARESE on Target Telephone #2. During the telephone call, VAUGHN asked, "[D]o I need to bring anything tonight ya think?" to which PANARESE replied, "No, I got one more, I got another half now." Based on my training and experience, as well as my participation in this investigation, I believe that this during this call VAUGHN inquired whether PANARESE needed VAUGHN to provide PANARESE with oxycodone pills that VAUGHN had been storing at

VAUGHN's Residence, Target Location #6, on behalf of PANARESE (*"[D]o I need to bring anything tonight ya think?"*). Based on PANARESE's response (*"no, I got 1 more, I got another half now"*), I believe that PANARESE stored oxycodone pills at his residence, Target Location #2, even while he stored the majority of his oxycodone pills at VAUGHN's residence, Target Location #6.

### *xi.   July 14, 2015: VAUGHN Sold 80 Oxycodone Pills To ROMANO*

82.   On July 14, 2015, a series of text messages were intercepted between ROMANO's Target Telephone #4 and VAUGHN, who used (339) 203-5108 (hereinafter, "VAUGHN Telephone #2").[18]  At approximately 1:07 p.m., VAUGHN sent a text message that read, "Yo. Im helpn my mother. If u want i can c u at 145 Near sams." ROMANO replied "80[.]" VAUGHN then said "Ok. C U 145." At 1:40 p.m., ROMANO sent a text message that read "Here," to which VAUGHN replied, "K." In anticipation of the meeting between ROMANO and VAUGHN, officers conducted surveillance on a side street near VAUGHN's residence. Officers confirmed that VAUGHN's vehicle was parked in the driveway. At approximately 1:45 p.m., VAUGHN called ROMANO and told ROMANO that VAUGHN was en route. At the same time, surveillance officers saw VAUGHN pull out of his drive way. Officers also saw VAUGHN, drive his vehicle past their location en route to meet ROMANO. Based on the intercepted text and physical surveillance, I believe that VAUGHN met ROMANO to sell 80 oxycodone pills.

---

[18]   I believe that VAUGHN is the user of this telephone number because agents conducting physical surveillance have observed ROMANO meet with VAUGHN in a manner consistent with the intercepted communications over Target Telephone #4 and the user of this telephone number.

**_Defendant PRESTERONE_**

> **i.** **_April 28, 2015, Through April 30, 2015: ROMANO And PRESTERONE Discussed Distribution Of Oxycodone Pills And Arranged For A Meeting To Pay For Previously Supplied Oxycodone Pills_**

83.     On April 28, 2015, at approximately 6:46 p.m., ROMANO used Target Telephone #1 and PRESTERONE used Target Telephone #3 to exchange a series of text messages. ROMANO wrote, "Yup working on it I am stuck with a hundred big and little I have to have someone take half of each I was trying to talk to you about it that day about how hard those ones are to do I am going to have to just get my own money to give you for them on thursday I know you think I am just fucking around but it is not the case am just going to have to eat the loss and sell them for less see you Thursday." PRESTERONE responded, "I'll come see u later or tomoro am and grab whatever u got & talk."

84.     Based on my training and experience, as well as my participation in this investigation, I believe that, in the above-mentioned communications, ROMANO and PRESTERONE discussed the distribution of oxycodone pills, and that ROMANO referenced two different types of oxycodone pills ("*big and little*"). I know that oxycodone pills come in different strengths, and that they are produced in various shapes and sizes depending on the pharmaceutical manufacturer. I am also aware that many oxycodone users prefer a particular strength, size, or shape of pill. As a result, some oxycodone pills are more sought after than others and more expensive than others. Based on the content of the text message exchanged between ROMANO and PRESTERONE described above, and what I have learned during this investigation, I believe that ROMANO told PRESTERONE that he was having a hard time distributing one type of oxycodone pill that PRESTERONE provided to ROMANO ("*how hard those ones are to do*"), and that he knew PRESTERONE suspected he was not working hard to

sell the pills he had ("*I know you think I am just fucking around*"). PRESTERONE decided to meet ROMANO to obtain whatever money ROMANO had as partial payment for oxycodone pills previously supplied ("*I'll come see u later or tomoro am & grab whatever u got*").

85.     On April 30, 2015, at approximately 7:23 p.m., PRESTERONE sent a text from Target Telephone #3 to ROMANO's Target Telephone #1. PRESTERONE wrote, "I'll meet u 1 hour at 8:15 whole foods[.]" Based on this intercepted text message and in anticipation of the transaction, investigators established surveillance on the Whole Foods Market in Lynnfield, Massachusetts. Investigators observed PRESTERONE inside the Whole Foods Market and, at approximately 8:45 p.m., they saw ROMANO arrive in the parking lot and then enter the store. While inside the Whole Foods, investigators saw ROMANO and PRESTERONE meet. After approximately five minutes, ROMANO walked out of the Whole Foods and ten minutes later, PRESTERONE also left the Whole Foods.

86.     Based on my training and experience, and information I learned through this investigation, I believe that ROMANO and PRESTERONE met at the Whole Foods in order for ROMANO to pay PRESTERONE for a portion of the oxycodone pills that ROMANO received from PRESTERONE for distribution.

### Defendant WILLIAMS

####     i.     *June 19, 2015: WILLIAMS Sold ROMANO 100 Oxycodone Pills*

87.     On June 19, 2015, at approximately 6:54 p.m., ROMANO received an incoming call on Target Telephone #4 from WILLIAMS, who used the WILLIAMS Telephone. In this call, ROMANO told WILLIAMS, "I can't go all the way up there right now." WILLIAMS asked, "What are you trying to get?" ROMANO replied, "I can get a bunch . . . I mean, but where are you?" WILLIAMS asked, "What's a bunch?" ROMANO answered, "I don't know. I

think I got enough for a pack almost. If I got to count my money -- I got to count it." Later in the call, ROMANO asked, "What do you wanna do, you want me to go home and count my money, then meet you, I guess? Can you head this way or maybe to Sue Chang's -- like right now?" WILLIAMS responded, "Maybe to your house. I don't want to go as far as Sue Chang's." ROMANO said, "Yeah. All right. Meet Route 1 somewhere. I just can't meet my house. Are you gonna leave now?" WILLIAMS responded affirmatively.

88.     Based on my training and experience, as well as my participation in this investigation, ROMANO informed WILLIAMS that he had almost enough cash for 100 pills ("I think I got enough for a pack almost. If I got to count my money."). Later, ROMANO and WILLIAMS discussed logistics of where to conduct the transaction.

89.     At approximately 7:14 p.m. that same evening, WILLIAMS used the WILLIAMS Telephone to call ROMANO on Target Telephone #4. In this call, ROMANO told WILLIAMS, "I need a pack." WILLIAMS and ROMANO then discussed where to meet. ROMANO suggested "the pet store off Route 1," but WILLIAMS did not know where it was. Ultimately, they agreed to meet at Subway. ROMANO told WILLIAMS, "I need 100, and um, I need a 100 and, um, let's see -- I had 2180 ... so, I got 2180, 24. Just give me 100."

90.     Based on my training and experience, as well as my participation in this investigation, I believe that in this intercepted call ROMANO ordered a pack of 100 oxycodone pills from WILLIAMS. ROMANO and WILLIAMS then agreed to a meeting location. ROMANO reassured WILLIAMS that he had approximately $2,400 to purchase the 100 oxycodone pills (*"I need 100, and um, I need a 100, and, um, let's see – I had 2180 ... so, I got 2180, 24 – just give me 100"*).

91.     Shortly after this intercepted call, surveillance officers observed WILLIAMS's car in the Subway parking lot in Peabody, Massachusetts, just off of Route 1.  At approximately 7:22 p.m., ROMANO arrived at Subway and entered the restaurant.  Approximately one minute later, ROMANO left the Subway restaurant.  Surveillance officers then observed WILLIAMS exit a short while later.  WILLIAMS entered the WILLIAMS's car and drove away.  Based on my training and experience, as well as my participation in this investigation, I believe that ROMANO met WILLIAMS in the Subway restaurant as agreed-upon during the intercepted communications and purchased a pack of 100 oxycodone pills from WILLIAMS.

### ii.     *July 2, 2015:     ROMANO Ordered 100 Oxycodone Pills From WILLIAMS*

92.     On July 2, 2015, ROMANO used Target Telephone #4 to make an outgoing call to the WILLIAMS Telephone used by WILLIAMS.  During the call, ROMANO said, "I need like a pack."  WILLIAMS responded, "I'll be up there very shortly[.]"  During the call, ROMANO and WILLIAMS arranged to meet in a public area.  At approximately 10:59 a.m., ROMANO again called WILLIAMS and asked, "Where are you Paul?"  Williams replied, "I'm on Route 1 . . . got a little traffic."  ROMANO later in the conversation said, "I gotta [go to the bathroom] somewhere around here . . . My car is more over near the cemetery[.]"  WILLIAMS responded, "Ok, I'll be right there."  Based on my training and experience, as well as my participation in this investigation, I believe that ROMANO requested 100 oxycodone pills ("*a pack*") from WILLIAMS for distribution.  I also believe that they completed the transaction, because ROMANO and WILLIAMS both acknowledged that they were at the meeting location ("*My car is more over near the cemetery . . . ok I'll be right there.*").

### iii.    *July 13, 2015: Meeting Between ROMANO And WILLIAMS To Obtain A Resupply Of Oxycodone Pills*

93.    On July 12, 2015, at approximately 8:32 p.m., ROMANO used Target Telephone #4 to send WILLIAMS a text message that read, "Cal me first need 80." Almost thirty minutes later, at 9:01 p.m., ROMANO used Target Telephone #4 to call WILLIAMS and confirm that WILLIAMS would be in Boston area the next morning to complete a drug transaction. Based on my training and experience, and my participation in this investigation, I believe that the above-described intercepted communications between WILLIAMS and ROMANO were for the purpose of arranging a meeting (*"Cal me first need 80"*) at WILLIAMS's residence, Target Location #3, the next day so that ROMANO could obtain more oxycodone pills.

94.    The following day, on July 13, 2015, at approximately 8:36 a.m., ROMANO used Target Telephone #4 to call WILLIAMS. During the telephone conversation; ROMANO said, "You can't come down here, no?" WILLIAMS replied, "There's no way dude. I'm trying to see a whole bunch of people here and head back down the cape." ROMANO then said, "Alright can you give me a minute? I'm going to leave in 15 minutes, 20." WILLIAMS replied, "Ya, no problem. I'm going to be home for an hour at least." Later that morning, at approximately 9:13 a.m., ROMANO received an incoming call on Target Telephone #4 from the WILLIAMS Telephone in which WILLIAMS said, "Where are you?" ROMANO replied, "Where are you?" WILLIAMS responded, "I'm at my house waiting for you. I gotta hurry. I got my guy coming any minute." ROMANO then asked, "What -- the house in Malden?" WILLIAMS answered "Ya, on Broadway, ya. I got my guy coming any minute so I gotta see you first." ROMANO said, "Alright." On that date, the court-authorized GPS tracking device attached to ROMANO's car indicated that ROMANO arrived at the vicinity of WILLIAMS's residence, Target Location #3, at approximately 9:17 a.m. and left at approximately 9:36 a.m.

95.     Based on my training and experience, my participation in this investigation, and GPS tracking data on ROMANO's car, I believe that ROMANO traveled to WILLIAMS's residence, Target Location #3, on July 13, 2015, to obtain 80 oxycodone pills, per his text message the previous night.

### Defendants TURNER, SR. & A. TURNER

#### i.      April 29, 2015: TURNER SR. Advised ROMANO That He Was Considering Buying 1,000 Oxycodone Pills

96.     On April 29, 2015 at approximately 11:31 a.m., ROMANO received a call on Target Telephone #1 from telephone number (978) 210-5937, which I believe is used by TURNER SR (hereinafter, the "TURNER SR. Telephone").[19]   During the call, TURNER SR. asked, "If I pick up some of those things, how much would you give me a piece?" ROMANO answered, "I don't know. Work with me, like, you know? What are you getting them for? Let's work together. Instead of how much would you give me a piece, work with me." TURNER SR. responded, "Oh, what will you be willing to pay is what I need to know." ROMANO again said, "Why don't you just work with me?" TURNER SR. then said. "What are you paying now?" ROMANO replied, "27 . . . sometimes 25 . . . It depends who I get them from. That's the thing . . . Usually the kid gets its for 23 and he tacks on two bucks." TURNER SR. then asked, "So what do you think P.W. is paying?" ROMANO said, "He probably paying the same thing, he just lies. You know what I mean? If you can get them for around 23 bucks, 22 bucks. Somewhere around there. You be doing pretty good right now." TURNER SR. then said, "I was thinking of maybe getting a 1,000."

---

[19]   I believe that TURNER SR. is the user of this telephone number for the following reasons. First, ROMANO referred to TURNER SR. by his first name "Dave" in an intercepted call. Second, agents conducting physical surveillance have observed ROMANO travel to TURNER SR.'s residence in a manner consistent with the intercepted communications over Target Telephone #1 and the user of this telephone number.

97.     Based on my training and experience, as well as my participation in this investigation, I believe that, during this call, ROMANO and TURNER SR. discussed TURNER SR.'s desire to obtain 1,000 oxycodone pills (*"I was thinking of maybe getting a 1,000."*). TURNER SR. inquired what price ROMANO was paying for oxycodone pills (*"What are you paying now?"*), and ROMANO told TURNER SR. that the price was dependent on who he purchased the pills from (*"It depends who I get them from"*). TURNER SR. asked how much Paul WILLIAMS paid for pills when he referred to "P.W." (*"what do you think P.W. is paying?"*).

### ii.     *May 15, 2015:  ROMANO Requested That A. TURNER Continue His Oxycodone Pill Business While ROMANO Is Out Of Town*

98.     On May 15, 2015, at approximately 5: 52 p.m., ROMANO used Target Telephone # 1 and called the A. TURNER Telephone.  During their conversation, ROMANO told A. TURNER that he would be away for a week from May 31, 2015, through June 8, 2015, and suggested that A. TURNER distribute oxycodone pills while ROMANO was away. ROMANO said, "Yea, Ash why don't you fucking just take the fucking week off from work the week of May31st and pop fucking pills? . . . You will make fucking double the money. . . . I mean, you have to get fifty at a time from Paul WILLIAMS." A. TURNER responded, "If you're serious I'll do it, but I mean I really do gotta make money." ROMANO then said, "But when you do it, you gotta meet people like . . . there gonna know you got them[.]" A.TURNER replied, "No, no, no, I will." Based on my training and experience, as well as participation in this investigation, I believe that during the above-described telephone call ROMANO suggested that A. TURNER assume ROMANO's oxycodone pill distribution business while ROMANO went away.  I also believe that ROMANO instructed A. TURNER to purchase 50 pills at a time from WILLIAMS (*"I mean you have to get fifty at a time from Paul Williams."*).

###### iii.     *June 18, 2015:  ROMANO Discussed With WILLIAMS The Fact That TURNER SR. And A. TURNER Had Stolen Oxycodone Customers From ROMANO*

99.     On June 18, 2015, at approximately 4:21 p.m., ROMANO used Target Telephone #4 to call WILLIAMS on the WILLIAMS Telephone.  During this call, WILLIAMS told ROMANO, "I was just checking in with you cause I haven't heard from you."  ROMANO advised WILLIAMS, "Dude, they stole half my business.  They stole half my business." WILLIAMS replied, "Ya.  I haven't heard from none of them."  ROMANO said, "Ya, Dave used to, Dave used to get, like, 20, or you know, 25 off me a day.  And, and his daughter, like, I set her up with some people, and she was getting the same.  You know, so that's, like, 50 a day." ROMANO continued, "And then all of a sudden I get home from vacation [and] neither one of them has called me once.  So I think . . . So I think what they were doing the two weeks I was away, I think they, like, when they were getting them from you, I think they were just like using their own money that they were making, and just getting an extra say 10 or 20 for themselves every day. and they just like saved up, ya know?"  WILLIAMS responded in part, "I haven't heard neither one of them, I tell ya."  ROMANO continued, "No, that's what they did.  They, they, they were, like, sneaking it in -- you know what I mean.  Like, they would tell me they were going to see you, but they would get like, you know, twenty for themselves every day.  You know that adds up.  They probably got, you know, a couple hundred pills, you know."

100.    Based on my training and experience, as well as my participation in this investigation, I believe that in this call, ROMANO explained to WILLIAMS, that one of the reasons ROMANO had not been in contact with WILLIAMS was that TURNER SR. and A. TURNER took customers from ROMANO while ROMANO was on vacation ("*they stole half my business*").  ROMANO explained that TURNER SR. typically bought 20-25 oxycodone pills

per day from ROMANO ("*Dave used to get, like, 20, or you know 25 off me a day*") and that A. TURNER was buying a similar amount per day ("*and his daughter ... she was getting the same*").   ROMANO noted that he had directed some of his customers to contact A. TURNER while he was on vacation ("*I set her up with some people*").   ROMANO noted that he had not heard from TURNER SR. or A. TURNER since he returned from vacation ("*And then, all of a sudden, I get home from vacation, neither one of them has called me once.*").   ROMANO expressed his belief that TURNER SR. and A. TURNER bought extra pills from WILLIAMS while ROMANO was on vacation and stockpiled the pills so that they could continue to sell pills to ROMANO's customers even after ROMANO returned from vacation ("*So I think what they were doing the two weeks I was away, I think they, like, when they were getting them from you, I think they were just like using their own money that they were making, and just getting an extra say -10 or 20 for themselves every day, and they just like saved up ya know. . . . that adds up. They probably got, you know, a couple hundred pills,*").

### iv.   July 9, 2015:   WILLIAMS Admitted To ROMANO That WILLIAMS Provided Oxycodone Pills To TURNER SR.

101.   On July 9, 2015, at approximately 3:02 p.m., ROMANO used Target Telephone #4 to call WILLIAMS on the WILLIAMS Telephone.   During their conversation, ROMANO told WILLIAMS that ROMANO figured out that one of his oxycodone customers was obtaining oxycodone pills from TURNER SR.   ROMANO asked WILLIAMS, "You swear you don't [sic] give those pills to Dave Turner?   'Cause I just had somebody buy a 25 pack off him?"   WILLIAMS responded, "Dave Turner does my landscaping.   I gave him some pills to do my landscaping.   I gave him pills for pay.   I didn't sell him any . . . two days ago . . . I gave him a 25 pack . . . He started my yard two weeks ago."   Later that same day, at approximately 6:33 p.m., ROMANO used Target Telephone #4 to call WILLIAMS on the WILLIAMS Telephone to

continue their conversation.   ROMANO said, "Paul you know what? . . . You've given him . . . more than that[.]"  WILLIAMS replied, "I gave him $3,500 worth, 500 at a time.  Whatever it came out to."  ROMANO responded, "I know. . . . just do me a favor . . . and just don't give him another fucking thing."

102.    Based on my training and experience, as well as my participation in this investigation, I believe that in the above-referenced calls, ROMANO confronted WILLIAMS and requested that WILLIAMS explain why WILLIAMS was supplying TURNER SR. with oxycodone pills (*"you swear you don't [sic] give those pills to Dave Turner cause I just had somebody buy a 25 pack off him?"*).  Based on the conversation, I believe WILLIAMS admitted to providing TURNER SR. with the pills in exchange for landscaping work (*"I gave him pills for pay"*) and that he provided TURNER SR. with "*$3,500 worth*" of oxycodone pills.

     *v.*    ***July 10, 2015:  TURNER SR. Admitted to ROMANO That TURNER SR. Obtained Oxycodone Pills From WILLIAMS***

103.    On July 10, 2015, at approximately 10:31 a.m., ROMANO used Target Telephone #4 to call TURNER SR. on the TURNER SR. Telephone.  During their telephone conversation, ROMANO asked TURNER SR., "You call Paul for fucking pills?"  TURNER SR. affirmatively answered, "Yeah, 'Cause I did a job for him," to which ROMANO replied, "I'm telling you . . . stop calling my guys for pills."  Later that morning, on a separate call using the same telephone numbers, WILLIAMS said to ROMANO, "First of all . . . Joe.  I'll do whatever I want when I want . . . I don't know why you think you . . . run this fucking . . . West Peabody like you own it."  ROMANO then said, "You wouldn't like it if I fucking went to the guy you were getting pills from in New York and was fucking like, 'send those things to me, not Dave.'  I think that I fucking helped your daughter, out and then all of a sudden . . . you were getting her fucking pills, and then she's selling them to the people she met through me."

104.   Based on my training and experience, and participation in this investigation, I believe the above-referenced telephone communication TURNER SR. admitted to ROMANO that he obtained oxycodone pills from WILLIAMS (*"yeah, cause I did a job for him"*) to which ROMANO replied, "I'm telling you . . . stop calling my guys for pills."

### Defendants S. MILBURY & M. MILBURY

#### i.   April 23-28, 2015:  ROMANO Offered To Sell Oxycodone Pills to S. MILLBURY At A Reduced Price

105.   On April 23, 2015, at approximately 8:02 p.m., ROMANO received a text message on Target Telephone #1 from the S. MILBURY Telephone used by S. MILBURY. S. MILBURY's text read, "Price ? 55[.]"  ROMANO responded, "Ya 28 same as before what time." Based on my training and experience, as well as my participation in this investigation, I believe that S. MILBURY wanted to purchase 55 oxycodone pills (*"55"*), and ROMANO gave him the same price he had on a prior occasion – $28 per pill (*"28 same as before"*).

106.   On April 28, 2015 at approximately 11:51 a.m., ROMANO sent S. MILBURY a text message from Target Telephone #1.  ROMANO said, "You are the only one I give them to for that price so keep it low I only do it cause me and you been doing it for years but honestly I charge no less than thirty two now cause I have to put up so much cash just to get a hundred hopefully when the summer comes it gets flooded with pills so the price will go down the problem is no one has them so there is no one for me to go to besides my regular people." S. MILBURY replied "I understand, appreciate it."

107.   Based on my training and experience, as well as my participation in this investigation, I believe that, during these series of text messages, ROMANO informed S. MILBURY that S. MILBURY was the only person to whom he gave the oxycodone pills at a reduced price because they have a longstanding relationship.

### ii.     April 30, 2015:  ROMANO Sold M. MILBURY 75 Oxycodone Pills

108.    On April 30, 2015, at approximately 4:43 p.m., ROMANO received an incoming text message on Target Telephone #1 from the M. MILBURY Telephone.  The message read "Hey would u be able to 75 around 8/830 tonight?  What cost?"  ROMANO replied, "Twenty eight and yes[.]  You just have to let me know if it is a definant [sic] or not with in the hour so I can get them[.]"  M. MILBURY responded by text message, "So def gonna want 65-75 around 8/830 tonight. I will have her come here and call u to come so I'll have cash when u get here[.]"

109.    Based on my training and experience, and information learned while participating in this investigation, I believe that M. MILBURY contacted ROMANO in order to purchase 75 oxycodone pills and if so, what the cost would be (*"Hey would u be able to 75[?] . . . What cost?"*).  ROMANO replied that he would be able to supply her with 75 oxycodone pills, and that the price was $28 per pill (*"Twenty eight"*).  Investigators conducted surveillance on the MILBURY Residence, at approximately 5:25 p.m., on April 30, 2015, surveillance officers saw ROMANO's car arrive and park near the MILBURY Residence.  At 5:33 p.m., surveillance officers saw ROMANO leave the MILBURY Residence.  I believe that ROMANO and M. MILBURY completed the drug transaction they had discussed earlier in the day because the time ROMANO spent at the MILBURY Residence and the content of their earlier calls is consistent with a drug transaction.

### iii.     April 30, 2015:  S. MILBURY Placed An Order And Picked Up 55 Pills From ROMANO

110.    On April 30, 2015, S. MILBURY used the S. MILBURY Telephone to exchange a series of text messages with ROMANO, who used Target Telephone #1.  At approximately 8:12 a.m., S. MILBURY wrote, "You want to do Burlington run this morning?"  ROMANO replied via text message, "I can go get them but how long honestly[.]"  Later that morning, at

approximately 9:51 a.m., S. MILBURY sent a text message to ROMANO that read, "Leaving my house 5-10 min[.]"  ROMANO responded, "How many[?]" to which S. MILBURY replied "55[.]"  ROMANO then directed S. MILBURY to the meeting location by sending a text message that read, "Ok, go to Brother's on route one[.]"  At approximately 10:10 a.m., S. MILBURY used the S. MILBURY Telephone to call ROMANO on Target Telephone #1 and asked, "I'm in the car where am I going?"  ROMANO answered, "Go to Brothers on Route 1 where 7-11 is . . . you know . . . Brothers Kouzina."  After talking through further directions, S. MILBURY replied, "I'll be there."  ROMANO then instructed, "I'm gonna park in the back of like 7-11 and leave them in my car for ya . . . I'm gonna leave them right in the glove compartment for yeah alright . . . Try to do it inconspicuous[.]"  S. MILBURY then said, "Okay, no problem . . . Alright that's cool."  At approximately 10:26 a.m., that same morning, S. MILBURY used the S. MILBURY Telephone to send a text message to Target Telephone #1 that read, "Got em."

111.    Based on my training and experience, and participation in this investigation, I believe that in the intercepted communications between S. MILBURY and ROMANO arranged for a drug transaction of 55 oxycodone pills ("want to do Burlington run . . . I can got get them . . . how many ... 55).  I also believe that this transaction was completed as confirmed by S. MILBURY's text message to ROMANO (*"Got em."*)

### iv.    *July 9, 2015: S. MILBURY and ROMANO Discussed CW-1's Arrest On Friday, June 26, 2015*[20]

112.    On July 9, 2015, at approximately 1:30 p.m., S. MILBURY using the S. MILBURY Telephone to call ROMANO on Target Telephone #4. In this call, ROMANO asked

---

[20]  As discussed previously, CW-1 was arrested after investigators saw CW-1 complete a drug transaction.

S. MILBURY whether he "found it in the paper." S. MILBURY answered affirmatively and noted, "We're all good. He doesn't even know – he doesn't even know your name, man." ROMANO said, "'Cause I looked in the paper, and I couldn't find anything on, like, uhhhh, over the weekend – drug arrests, nothing." S. MILBURY responded, "Noooooo, this was, uhhhh -- this was, like, two weeks ago." S. MILBURY reminded ROMANO, "Yeah, it was a Friday when I was, uhhh -- remember I was in Canada a couple weeks ago?" ROMANO said, "I'm like stressed... Why didn't, uhh, she say anything to me?" S. MILBURY answered, "I think we just -- it just never did -- I don't know -- I think I -- I -- I thought she did and she thought I did." S. MILBURY then tried to reassure ROMANO, "You have nothing to worry -- I mean -- the only one that -- the only thing they'd seen in the phone is a text from me. So, you'd have to -- it would have to be me -- to get you involved." ROMANO asked, "What was it Mass Police?" S. MILBURY replied, "Yeah. He's an idiot. Just like everyone, he got on the highway and crushed a -- you know." S. MILBURY continued, "That's always gonna happen, you know. I gotta stop doing that. On the road." ROMANO responded in part, "Dude you gotta be careful when you sniff 'em. Yeah, definitely you can't just you know? See I've driven by you. Seen you do it." MILBURY replied, "Oh yeah, I know. That's what happened to him. So, but, uhhhh, the kid is rock solid. I'm really not that worried. He's rock solid to be honest with you. He knows me back in the college days." S. MILBURY continued, "It just -- it sucks, you know. Now my phone's in a file somewhere, I'm sure ya know? My number."

113.    Based on my training and experience, as well as my participation in this investigation, I believe that in this call S. MILBURY and ROMANO discussed CW-1's arrest (as described in Section II. A. above). ROMANO asked S. MILBURY whether he saw the newspaper article ("*found it in the paper*"). S. MILBURY stated he had, but reassured

ROMANO ("*we're all good*") and reminded ROMANO that CW-1 did not know ROMANO ("*he doesn't even know your name, man*").   ROMANO asked why M. MILBURY had not mentioned the arrest to ROMANO ("*why didn't. uhh, she say anything to me*").   S. MILBURY explained that his wife (M. MILBURY) thought he had told ROMANO, and he thought she had told ROMANO ("*I thought she did and she thought I did*").   S. MILBURY tried to reassure ROMANO ("*you have nothing to worry about*") as the only way ROMANO could get in trouble was if S. MILBURY talked to authorities ("*it would have to be me to get you involved*") because the only evidence on CW-1's phone would be a text message from S. MILBURY ("*the only thing they'd see in the phone is a text from me*").   S. MILBURY asserted that CW-1 was arrested because he crushed and inhaled an oxycodone pill while he was driving ("*he got on the highway and crushed a – you know*").   MILBURY assured ROMANO that he knew CW-1 from college ("*he knows me back in the college days*") and that CW-1 would not talk to authorities ("*the kid is rock solid. I'm really not that worried*").

   v.   **July 9, 2015:   ROMANO Agreed To Have Eight Oxycodone Pills Delivered To S. MILBURY**

   114.   On July 9, 2015, at approximately 8:32 p.m., ROMANO used Target Telephone #4 to exchange a series of text messages with the S. MILBURY, who used the S. MILBURY Telephone. S. MILBURY's text read, "Friend just called 8 if u want." ROMANO replied, "U Cant wait til early morning[?]" S. MILBURY responded, "kid going out tonight. It ok if no, just checking cuz kid text me[.]" ROMANO asked, "U ready rite now[?]" After S. MILBURY answered affirmatively, ROMANO instructed S. MILBURY, "Go to happy liquor . . . Near mall[.]" S. MILBURY replied, "That close for me cuz highway. I'll be there 4- 5 mins[.]" ROMANO texted back, "My girl is meeting u 8rite please b there." S. MILBURY answered, "Pulling in now[.]"

115.   Based upon my training and experience, as well as my participation in this investigation, I believe that, in this series of intercepted text messages, S. MILBURY informed ROMANO that S. MILBURY had a customer who wanted 8 oxycodone pills (*"Friend just called 8 if u want"I*). ROMANO initially wanted to wait until the next day (*"U Cant wait til early morning"*), but then agreed to have the pills delivered that night (*"U ready rite now"*). ROMANO advised S. MILBURY that ROMANO's girlfriend[21] would deliver the pills (*"my girl is meeting u"*) at a liquor store near the North Shore Mall (*"Go to kappy liquor . . . Near mall"*), and sought confirmation that S. MILBURY wanted 8 oxycodone pills (*"8rite"*). S. MILBURY noted that he could be right there (*"That close for me cuz highway . I'll be there 4- 5 mins"*).

116.   At approximately 9:09 p.m., that same evening, ROMANO used Target Telephone #4 to call the S. MILBURY Telephone. ROMANO informed S. MILBURY that his "girl is gonna be there in 1 to 2 minutes." S. MILBURY advised ROMANO, ". . . I'm pulling in right now." ROMANO confirmed S. MILBURY's order, "You want eight right?" S. MILBURY responded affirmatively, and informed ROMANO, "I'm here. I'm in the Kia." ROMANO replied, "Alright. She is pulling in. She's gonna call ya. She's pulling in. She'll be there in one minute." ROMANO further confirmed, ". . . She has 8 for ya." S. MILBURY subsequently sent another text message to ROMANO that stated, "some douche bag almost get your girl w her car in Parking lot ... Close[.]"

117.   Based upon my training and experience, as well as my participation in this investigation, I believe that in this call ROMANO confirmed with S. MILBURY that his girlfriend was en route with eight pills for S. MILBURY (*"She'll be there in one minute . . . She*

---

[21]   Prior to this date, investigators had seen ROMANO's girlfriend and were aware of her interaction with ROMANO.

*has 8 for ya"*). Given that S. MILBURY told ROMANO that he saw his girlfriend in the parking lot (*"some douche bag almost get your girl w her car in Parking lot ... Close"*), I believe that ROMANO's girlfriend delivered the pills as ROMANO had promised. Later that evening, at approximately 9:17 p.m., S. MILBURY used the S. MILBURY Telephone to send a text message to ROMANO on Target Telephone #4 and confirmed that the deal was completed.

## III.  **Target Locations**

### A.  *Drug Traffickers' Use of Residences Generally*

118.  Based upon my training, experience, participation in other narcotics investigations, and extensive discussions with other law enforcement officers experienced in narcotics investigations, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia and records in their residences for longer periods of time than they keep drugs in their residences. I have participated in the execution of numerous search warrants of the residences of drug traffickers whose criminal activity is similar to that of the DEFENDANTS. In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, drug related evidence has typically been recovered including cash, records, drugs, and other valuable items. Based on this experience and my training, I believe that:

> a.  Drug traffickers often find it necessary to store large sums of cash received from the sale and distribution of controlled substances outside the normal banking system. Accordingly, narcotics traffickers frequently maintain large amounts of cash and other valuable assets at their residence in order to maintain and finance their ongoing business;
>
> b.  Drug traffickers frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders, emails, and other documents relating to the transportation, ordering, sale and distribution of controlled substances and monetary instruments and other assets, and to debts and collections relating to monies owed or due for the distribution of controlled substances; and documents relating to the transportation of controlled substances, such as travel itineraries,

plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts. Such documents may be maintained in paper or electronic form, and are generally maintained where the narcotics traffickers have ready access to them, including in cell phones and other electronic media capable of storing such information electronically, at locations such as their residences or other locations where they regularly conduct their drug business. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises;

c.      It is common for drug dealers to secrete records of drug transactions in secure locations within their cell phones, computers, residences, businesses, and/or other locations and devices over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities;

d.      It is common for significant drug traffickers to hide controlled substances, proceeds of drug sales (i.e., large amounts of currency, financial instruments, jewelry, safety deposit keys and deeds to real property), and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, documents indicating travel in interstate and foreign commerce, and evidence of financial transactions relating to obtaining, transferring, hiding or spending large sums of money made from controlled substance trafficking activities in secure locations within residences, businesses, or other locations over which they maintain dominion and control, for ready access and to conceal them from law enforcement authorities;

e.      Drug traffickers commonly maintain electronic and paper books or documents which reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization, and other contact or identification data relating to the distribution of controlled substances. Such records and items are maintained where the traffickers have ready access to them, commonly on the traffickers' cell phone(s). They also tend to maintain for long periods of time telephone billing records that evidence the placing of large numbers of calls each month in connection with narcotics dealing;

f.      Drug traffickers commonly have photographs of themselves, their associates, their property and their products in their possession or in their residences, and frequently maintain these photographs on their cell phone(s) and other electronic devices;

g.      Drug traffickers frequently maintain the items described above inside safes, key-lock strong boxes, suitcases, safe-deposit boxes and other containers, which are further secured by combination and/or key locks of various kinds in order to hide the contraband from other individuals living at or in the vicinity of their residence;

h.      Drug traffickers frequently build "stash" places within their residences or other locations in order to store illicit drugs as well as the items described above;

i.      Residents, whether drug traffickers or not, typically keep items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

119.    In my training and experience, I know that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance.  A cellular telephone is a handheld wireless device used for voice and text communication as well as for accessing the internet.  Telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls and text messages made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities.  These capabilities

include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Based on my training, experience, and research, I know that many cellular telephones have capabilities described above. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device as well as his criminal accomplices. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to further prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

120.  Based upon all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth hereinafter, I believe the DEFENDANTS, like many drug traffickers, use their residences in furtherance of their ongoing drug-trafficking activities, and that, among other things, documentary and other evidence regarding those activities, including, but not limited to, the items set forth in Attachments B, will be found in the Target Locations. *See e.g.*, *United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999).[22]

---

[22]  In *Feliz*, the First Circuit made clear that, in the drug trafficking context, evidence of drug transactions can be expected to be found in a drug trafficker's residence for months after evidence of the last transaction. 182 F.3d at 87 ("[C]ourts have upheld determinations of probable cause in trafficking cases involving [three months long] or even longer periods") (citing *United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991)(two year-old information relating to

### B.     *Description and Criminal Activity at Target Locations*

#### (1)     **ROMANO's Residence – Target Location #1**

Description of Target Location #1

121.    4 Jill's Way, Peabody, Massachusetts, is located in Essex County, Massachusetts. Jill's Way is a cul-de-sac located off of Grandview Avenue in Peabody, Massachusetts. This location is a single family colonial style house with brown siding. 4 Jill's Way has a standard size front door and a double wide garage door located on the left side of the house. A detailed description appears in Attachment A-1, which is attached hereto and incorporated herein by reference.

Link to Criminal Activity

122.    On August 18, 2015, records from the Massachusetts Registry of Motor Vehicles showed that ROMANO listed Target Location #1 as his residential address. Investigators have conducted physical surveillance and court-authorized GPS tracking of ROMANO's car – described as being used in several oxycodone pill transactions above – since November 2014. As of August 3, 2015, the most recent date of physical surveillance, law enforcement officers confirmed that ROMANO's car was parked in the driveway of Target Location #1. According to the court-authorized GPS tracking device attached to ROMANO's car, and confirmed by multiple instances of physical surveillance, since April 2015 ROMANO's car departed from the area of Target Location #1 nearly every morning or afternoon, and later returned to the area of Target Location #1 where it remained overnight nearly every night. Throughout the investigation, every oxycodone pill transaction involving ROMANO's car was conducted by

marijuana operation not stale)). As the First Circuit has explained "[b]y its very nature, drug trafficking, if unchecked, is apt to persist over relatively long periods of time." *United States v. Nocella*, 849 F.2d 33, 40 (1st Cir. 1988).

ROMANO who drove ROMANO's car. The evidence further established that ROMANO has an ongoing drug distribution business consisting of meeting with various oxycodone pill customers on public roads and in commercial parking lots and meeting with suppliers, *i.e.*, PANARESE, PRESTERONE, or WILLIAMS. Following nearly each day, ROMANO's car ultimately returned to the area of Target Location #1, sometimes having made one or more stops along the way. I therefore believe that there is probable cause to believe that evidence of his ongoing drug trafficking offenses, as set forth in Attachment B, will be found at Target Location #1.

### (2)   **PANARESE's Residence – Target Location #2**

Description of Target Location #2

123.   8 Moore Street, Peabody Massachusetts, is located in Essex County, Massachusetts. This location is a ranch style home with an attached garage living area located on Moore Street between Lowell Street and Patricia Road, Peabody, Massachusetts. The house is covered with white siding and has two front standard size doors and a double wide single garage door. A detailed description appears in Attachment A-2, which is attached hereto and incorporated herein by reference.

Link to Criminal Activity

124.   On August 18, 2015, records from the Massachusetts Registry of Motor Vehicles show that PANARESE has listed Target Location #2 as his residential address. On August 9, 2015, the most recent date of physical surveillance, investigators confirmed that PANARESE's car was seen parked at Target Location #2. Evidence obtained during this investigation has indicated that PANARESE has an ongoing oxycodone distribution business. Additionally, and significantly, investigators have intercepted multiple calls in which ROMANO, PANARESE and/or Eric VAUGHN discussed storing oxycodone pills at Target Location #2. For example,

and as described in Section II. B. above, as recently as July 13, 2015, PANARESE told

VAUGHN that he (PANARESE) continued to have a stash of oxycodone pills at his residence.

Moreover, as also described in Section II. B. above, during the course of this investigation

ROMANO often called PANARESE to place either place order of oxycodone pills or arrange for

payment of oxycodone pills that he had already distributed and frequently met with PANARESE

to complete these transactions at or near Target Location #2.   Because Target Location #2 also

appears to serve as a base of operations from which PANARESE orchestrated his drug

trafficking activities, I believe there is probable cause that evidence of his ongoing drug

trafficking activities, as set forth in Attachment B, will be found at Target Location #2.

### (3)   WILLIAMS's Residence – Target Location #3

#### Description of Target Location #3

125.    39 Broadway, Unit #304, Malden, Massachusetts, is located in Middlesex County,

Massachusetts.   This location is a three story multi-unit condominium dwelling with beige siding

and white trim.   There is a main entrance centrally located on the side of the building facing

Broadway.   A "Cityline Condominium" sign is clearly displayed along the side of the building.

The number "39" is clearly displayed on the main entrance glass door.   Unit #304 is located on

the third floor of the complex.   There is parking located underneath and along the left and right

sides of the condominium complex.   A detailed description appears in Attachment A-3, which is

attached hereto and incorporated herein by reference.

#### Link to Criminal Activity

126.    National Grid, the utility service provider for the city of Malden, Massachusetts,

lists WILLIAMS as the customer of record for 39 Broadway, Unit #304, Malden, Massachusetts.

In addition, records from the Secretary of the Commonwealth of Massachusetts lists WILLIAMS

as the owner of "Kristen's Used Furniture" with a primary address for WILLIAMS listed at 39 Broadway, Unit #304, Malden, Massachusetts. On August 3, 2015, the most recent date of physical surveillance on Target Location #3, WILLIAMS's car was seen by law enforcement officers parked outside of 39 Broadway, Malden, Massachusetts. Evidence obtained during this investigation established that WILLIAMS had an ongoing oxycodone distribution business and repeatedly supplied drugs to ROMANO and others, including TURNER SR. Physical surveillance as described in Section II. B. above established that WILLIAMS left his residence before meeting with ROMANO at a public location to resupply ROMANO with oxycodone pills. Additionally, as discussed in Section II. B. above, ROMANO traveled to WILLIAMS's residence to obtain additional oxycodone pills. Accordingly, I believe there is probable cause that evidence of WILLIAMS's ongoing drug trafficking activities, as set-forth in Attachment B, will be found at Target Location #3.

(4)     **TURNER SR.'s & A. TURNER's Residence – Target Location #4**

Description of Target Location #4

127.    1 Donegal Road, Peabody, Massachusetts, is located in Essex County, Massachusetts between Winona Street and Lake Street in Peabody, Massachusetts. This location is a split entry with white siding and wooden shingle façade located on the lower half. 1 Donegal Road has a standard size front door and a lower level entry door located on the left side of the house. There are two driveways located on the right and left side of the property. A detailed description appears in Attachment A-4, which is attached hereto and incorporated herein by reference.

Link to Criminal Activity

128.    On August 18, 2015, records from the Massachusetts Registry of Motor Vehicles showed that TURNER, SR. and A. TURNER list Target Location #4 as their residential address. On August 9, 2015, the most recent date of physical surveillance on Target Location #4, law enforcement officers saw TURNER SR. completing yard work at Target Location #4.   As described in Section II. B. above, during the course of this wiretap investigation between the months of April 2015 through July 2015, intercepted telephone conversations between ROMANO using Target Telephones #1 and #4 and A. TURNER's Telephone and TURNER SR.'s Telephone indicate that Target Location #4 has been used to complete oxycodone transactions. Additionally, as described in Section II. A. above, a UC purchased oxycodone pills directly from A. TURNER while at Target Location #4. Therefore, I believe there is probable cause to believe that evidence of the ongoing drug trafficking activities of A. TURNER and TURNER SR., as set-forth in Attachment B, will be found at Target Location #4.

**(5)    S. MILBURY's & M. MILBURY's Residence – Target Location #5**

Description of Target Location #5

129.    11 Hardy St, Danvers, Massachusetts. is located in Essex County, Massachusetts. This location is a colonial style home located on Hardy Street, off of High street and adjacent to Route 128 in Danvers, Massachusetts.  The house is covered with brown clapboard siding with white trim.   There is a driveway located on the right side of the property and front and rear entrance doors located on a front and rear porch.   A detailed description appears in Attachment A-4, which is attached hereto and incorporated herein by reference.

Link to Criminal Activity

130.    On August 18, 2015, records from the Massachusetts Registry of Motor Vehicles

showed that S. MILBURY and M. MILBURY list Target Location #5 as their residential address. Additionally, on August 10, 2015, the most recent date of physical surveillance on Target Location #5, law enforcement officers saw vehicles associated with S. MILBURY and M. MILBURY parked at Target Location #5. Evidence obtained during this investigation established that the MILBURYs had an ongoing oxycodone distribution business, that they were regularly supplied by ROMANO and conducted their drug trafficking business from Target Location #5. As described in Section II. B. above, M. MILBURY has been intercepted contacting ROMANO on Target Telephone #4 to place orders for oxycodone pills. Consistent with such calls, physical surveillance established that ROMANO delivered the requested oxycodone pills directly to M. MILBURY at Target Location #6. In addition, as described in Section II. B. above, CW-1 has corroborated evidence that M. MILBURY and S. MILBURY have completed drug transactions at Target Location #5. As such, I believe there is probable cause to believe that evidence of M. MILBURY's and S. MILBURY's ongoing drug trafficking activities, as set-forth in Attachment B, will be located at Target Location #5.

### (6) VAUGHN's Residence – Target Location #6

Description of Target Location #6

131. 3 Benevento Circle, Peabody, Massachusetts, is a single-family residence with brick and stucco siding. There is a staircase that leads to front door. The number "3" is displayed to the upper right of the front door. There is a driveway located to the right side of the residence. There is also a garage at the right side basement level to the house. A detailed description appears in Attachment A-6, which is attached hereto and incorporated herein by reference.

Link to Criminal Activity

132.    During this investigation, VAUGHN told PANARESE that he is living with his parents and provided "3 Benevento" as his residence.    In addition, officers conducting surveillance on VAUGHN saw VAUGHN driving his car to 3 Benevento Circle, Peabody, Massachusetts.   On August 9, 2015, the most recent date of physical surveillance on Target Location #6, law enforcement officers saw the vehicle that VAUGHN has been seen driving parked at Target Location #6.    As described in Section II. B. above, investigators have determined that VAUGHN has served as a distributor of oxycodone pills for PANARESE and at PANARESE's direction has stored a large portion of PANARESE's oxycodone at his (VAUGHN's) residence, Target Location #6.    Indeed, as noted in Section II. B. above, VAUGHN has contacted PANARESE to determine whether he should pick-up a batch of pills from his residence and take them to PANARESE for distribution.    Further, as described in Section II. B. above, PANARESE has directed ROMANO to obtain oxycodone pills from VAUGHN because VAUGHN has been storing PANARESE's supply of oxycodone pills.    As such, I believe that probable cause exists to believe that evidence of ongoing drug trafficking activities, as set-forth in Attachment B, will be located at Target Location #6.

## CONCLUSION

133.    Based on the information set forth above, I believe probable cause exists to conclude that the DEFENDANTS have conspired and continue to conspire to possess with intent to distribute, and to distribute, oxycodone in violation of 21 U.S.C. §§ 841(a)(1) and 846, and that evidence of said criminal offenses, as set forth in Attachment B of each of the respective search warrant applications for the Target Locations, will be found inside each Target Location.

I, Steven Racki, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

STEVEN RACKI
TASK FORCE OFFICER
DRUG ENFORCEMENT ADMINISTRATION

Subscribed and sworn to me this the 19th day of August 2015.

HON. MARIANNE B. BOWLER   USMJ
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

**ATTACHMENT A-1**

The premises at 4 Jill's Way Peabody, Massachusetts, the residence of Joseph Romano, is a colonial style house with brown siding. 4 Jill's Way has a standard size front door and a double wide garage door located on the left side of the house. Jill's Way is a cul-de-sac located off of Grandview Avenue in Peabody, Massachusetts. A street view image of the location is attached.



**ATTACHMENT A-2**

The premises at 8 Moore Street, Peabody, Massachusetts, the residence of Anthony Panarese, is a ranch style home with an attached garage / living area located on Moore Street between Lowell Street and Patricia Road Peabody, Massachusetts. The house is covered with white siding and has two front standard size doors and a double wide single garage door. A street view image of the location is attached.



## ATTACHMENT A-3

The premises to be searched are located at 39 Broadway, Unit 304, Malden, Massachusetts, the residence of Paul Williams. The premise is a three story multi-unit condominium dwelling with beige siding and white trim. There is a main entrance centrally located on the side of the building facing Broadway. A "Cityline Condominium" sign is clearly displayed along the side of the building. The number "39" is clearly displayed on the main entrance glass door. Unit #304 is located on the third floor of the complex. 39 Broadway Unit # 304, Malden Massachusetts is located directly on Broadway in Malden. There is parking located underneath and along the left and right sides of the condominium complex. A street view image of the condominium building is attached.



### ATTACHMENT A-4

The premises to be searched are located at 1 Donegal Road Peabody, Massachusetts, the residence of David Sr. and Ashley Turner, is a split entry with white siding and wooden shingle façade located on the lower half. 1 Donegal Road is located between Winona Street and Lake Street in Peabody, Massachusetts. 1 Donegal Road has a standard size front door and a lower level entry door located on the left side of the house. There are two driveways located on the right and left side of the property. A street view image of the location is attached.



## ATTACHMENT A-5

The premises to be searched are located at 11 Hardy Street Danvers, Massachusetts, the residence of Sans and Marcelle Milbury, is a colonial style home located on Hardy Street, off of High Street adjacent to Route 128 in Danvers, Massachusetts. The house is covered with brown clapboard siding with white trim. There is a driveway located on the right side of the property and front and rear entrance doors located on a front and rear porch. A street view image of the location is attached.



## ATTACHMENT A-6

The premises to be searched are located at 3 Benevento Circle, Peabody, Massachusetts, the residence of Eric Vaughn, is a single family residence with brick and stucco siding. There is a staircase that leads to front door. The number "3" is displayed to the upper right of the front door. There is a driveway located to the right side of the residence. There is also a garage at the right side basement level to the house. 3 Benevento Circle is located at the intersection of Benevento Circle and Goodale Street Peabody. A street view image of the location is attached.



## ATTACHMENT B

Items, documents, records, files, and other information that constitutes evidence or fruits of violations of 21 U.S.C. §§ 841(a)(1) and 846 (conspiracy with intent to distribute, and to distribute, controlled substances), including but not limited to:

1.      documentary or other evidence manifesting dominion and control over the premises, including, but not limited to, canceled mail, photographs, personal telephone books, diaries, bills and statements, videotapes, keys, identification cards and documents, airline tickets and related travel documents, bank books, checks, and check registers;

2.      books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances;

3.      evidence pertaining to obtaining, secretin, transfer, concealment and/or expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashiers checks, bank checks, safe deposit box keys and money wrappers;

4.      cellular and/or portable telephones;

5.      books or papers which reflect names, addresses and/or telephone numbers of associates in the trafficking organization.

I